617 So.2d 592 (1993)
Charles F. CAGLE and Inez Cagle, Plaintiffs-Appellees,
v.
Dr. Edward Keith LOYD and Dale O. Williams, as Co-Administrators of the Succession of Jess Loyd, Jr. and the ABC Insurance Companies, Defendants,
National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Intervenor on appealAppellant.
No. 92-594.
Court of Appeal of Louisiana, Third Circuit.
April 7, 1993.
Rehearing Denied May 25, 1993.
Writ Denied July 1, 1993.
*593 Carl W. Cleveland, New Orleans, Mary Olive Pierson, Baton Rouge, for Charles F. and Inez Cagle.
Bobby Stephen Gilliam, Shreveport, for Dr. Edward K. Loyd et al.
Anthony Joseph Rollo, Jr., Charles Rene Penot, Jr., New Orleans, James Carpenter Crigler, Jr., Lake Providence, Maureen O'Connor Sullivan, New Orleans, for National Union Fire Ins. Co.
Henry Cole Gahagan, Jr., Natchitoches, for Cole.
John Thomas Cox, Jr., Edward Keith Carter, Shreveport, for First Nat'l Bank of Shreveport.
David B. Means, III, Mansfield, for Young.
Before DOUCET, YELVERTON and COOKS, JJ.
YELVERTON, Judge.
The plaintiffs in these six lawsuits, now consolidated, are ranching families in the Northeast part of this state. The family names are Cagle, Johnson, Methvin, Young, James and Cole. They filed the suits for damages against the Succession of Jess Loyd, Jr. The judgment was based in part upon a finding that the plaintiffs had proved the tort of negligent misrepresentation committed by the deceased, Jess Loyd, Jr.
Originally filed in Caddo Parish, the cases were removed to Natchitoches Parish, a more convenient forum. The district court, following trial, found for the plaintiffs, awarding them damages in the total amount of $14,308,397, including interest, costs and expert witness fees.
The plaintiffs in their pleadings also asserted, and in the mind of the trial judge, proved, a claim based on duress. By the authority of La.C.C. art. 1964, the court awarded attorney's fees of $331,100.
The case is before us on a devolutive appeal taken by National Union Fire Insurance *594 Company of Pittsburgh, Pennsylvania. National Union issued certain directors and officers liability and corporation reimbursement policies to First National Bank of Shreveport. The deceased, Jess Loyd, Jr., was a director and officer of First National Bank (FNB). National Union was not a party in the proceedings below, but exercised its right to appeal under La.C.C.P. art. 2086, which grants the right to appeal to a party which could have intervened in the trial court. The Succession did not appeal.
National Union raises several issues, both legal and factual, in its appeal. Additionally, National Union has filed in this court an exception of no right of action to the claims of the Cole plaintiffs. In this court National Union has filed its own exception of prescription to the claims of all plaintiffs.
For reasons hereafter to be explained we affirm, with certain modifications, the award of damages. We reverse the award of attorney's fees. We grant the exception of no right of action, and remand for possible amendment. We affirm the trial court's overruling of the exception of prescription.

FACTS
Charles and Inez Cagle, Benton Johnson, Jack, Sam, and Carolyn Methvin, and the Methvin Partnership and Dwight and Gloria Young filed separate lawsuits against the Succession on April 18, 1988. McCauley and Elise James filed their suit on June 7, 1988. James, Alice, James, Jr., John, Tina, and James L. Cole filed their suit, according to their brief, in 1988.
These family groups raised cattle for a living, some for generations back. They made their living by what is known in ranching circles as the "cow-calf" operation. A cow-calf operation is one in which the rancher owns the cow, breeds her, raises the calf until it is weaned, then sells it. This is not a high profit operation, but it is low risk.
Jess Loyd, Jr., was a senior vice-president of FNB. He ran the agricultural lending department of the bank for 37 years. According to all of the testimony, Loyd was highly regarded by his bank and throughout the agricultural community around Shreveport, and was believed to possess uncommon and pervasive knowledge of the cattle industry and its financing.
Beginning in the late 1960's the plaintiffs moved their banking business from Natchitoches to Shreveport and established a credit relationship with FNB. Because theirs were agricultural loans, Loyd was their banker. Loyd became a part of their economic lives. Loyd retired from FNB in October 1986 and took his own life in April 1987.
When the plaintiffs' financial dealings with FNB began, Loyd announced that bank policy, his superior knowledge, and their economic success demanded that they move out of the traditional cow-calf operation into a ryegrass calf and feed lot calf operation. A ryegrass operation is the purchase of calves in the fall, fattening them on planted ryegrass in the winter, and selling them in the spring. A feed lot operation means taking the calves to a commercial feed lot, contracting with the feed lot based on the gain and cost to feed, then selling the animal when its weight and the market favorably coincide.
These ranching operations were unfamiliar to the plaintiffs. The trial court, in reasons for judgment, described how, from then on, Loyd became intimately involved in the economic lives of all plaintiffs. Loyd, the trial judge said
... acting as an officer of the First National Bank of Shreveport (FNB), either contractually or quasi-contractually assumed the obligation to manage, direct and control each plaintiff's cattle business. That control included (a) deciding to replace cow-calf operations with ryegrass and feed lot calf operations; (b) selecting the broker to buy calves; (c) selecting the broker to sell calves; (d) deciding the timing and quantities of all cattle transactions; (e) requiring hedging of cattle; (f) deciding when hedges should be closed; (g) selecting feed lots; (h) forcing purchases of entire herds of *595 cattle; (i) arranging all transportation; (j) culling cattle; (k) requiring bull purchases; (1) receiving and allocating payments from sales to debt selected by Loyd; (m) having plaintiffs sign large numbers of blank promissory notes; (n) intercepting close out statements from feed lots; and (o) making virtually every business decision regarding the plaintiffs' operations.
The testimony of numerous experts was that it was a mistake for plaintiffs to get out of traditional cow-calf ranching. Among these experts was Bob Odom, the Commissioner of Agriculture for the State of Louisiana. He testified that ranching of ryegrass calves and feedlots in Louisiana was risky and imprudent speculation. With the advantage of considerable hindsight, all of the experts agreed that this basic change was what ultimately led to the plaintiffs' eventual economic ruin. The trial judge found that this basic change in operations, and its nigh certainty of failure, was compounded by certain unwise decisions made by Loyd in his complete control and domination of the businesses. One of these unwise practices, according to the trial court's reasons for judgment, was:
Over 50,000 calves were purchased for the plaintiffs through a single broker. Tens of thousands were also purchased for Loyd's non-plaintiff customers by the same broker. According to Commissioner Odom and Kenneth Wolf, the operator of Clark's Auction Barn in Bossier City, the inevitable result was dramatically higher calf acquisition costs for Loyd's customers. During the fall calf-buying season, Loyd's broker, working five days per week for approximately four months, bought virtually every high grade 400 ± calf offered at every auction barn he could get to.
Throughout this time the plaintiffs' ranching operations plunged deeper into debt. Loyd managed to conceal from both the plaintiffs and his bank the real nature of his involvement. The plaintiffs were told that their losses were caused by market fluctuation, and that they "need just one good year to get out." While admitting that it would be wrong for a bank officer to run a customer's business, and that this was in violation of bank policy, bank officials, in depositions given after Loyd's suicide, indicated that they continued to believe in Loyd's expertise and that they were unaware that he had done anything in violation of bank policy.
The trial court found that Loyd never used his remarkable persuasive talents for self gain, and that he was not guilty of any criminal or fraudulent activities. His motivation is not clear from the record, but the testimony suggests that he enjoyed his control of the ranching activities. He visited the plaintiffs often, watched their operations, rode horses with them, and socialized with them.
The trial court did not find the plaintiffs at fault. The explanation for this, implicit in the reasons for judgment, was the court's finding as to the degree of dominance asserted by Loyd over the plaintiffs' cattle operations. As the plaintiffs' losses mounted, and their reliance on bank loans increased, Loyd's willingness to continue making loans and his confident predictions of a better day, rendered the plaintiffs virtually helpless from an economic standpoint.
The trial court found that, at the time plaintiffs suffered their losses as a consequence of the actions of Loyd, he was acting in his capacity as an officer of FNB. In its reasons for judgment, the court also said:
Although the Court has found Loyd to be individually liable for his actions, the Court is, nevertheless, obliged to assess fault against all other entities who might also be liable for the damages suffered by plaintiffs. In that regard, although the Court does not find plaintiffs guilty of any fault, the Court does find that FNB is also liable to plaintiffs. The Court assesses the percentage of legal fault attributable to Loyd at 90% and the percentage of legal fault attributable to FNB at 10% for its failure to more closely supervise Loyd. The Court specifically finds that although FNB was negligent in failing to properly supervise *596 Loyd in the performance of his job duties, that negligence was far out-weighed [sic] by the individual negligence of Loyd in the carrying out of his job duties. This finding of fact is consistent with the allocation of fault Mr. Woody, the banking practices expert, felt was justified after a thorough review of the Bank's policies and procedures and the deposition testimony of the Bank's high-ranking officers which was offered in evidence.

SPECIFICATION OF ERROR NUMBER 1
National Union begins its contentions of error with the argument that Loyd, if acting within the course and scope of his employment, could not be personally liable for non-fraudulent conduct which did not cause personal injury. The issue can be stated this way: Can a bank officer, acting in his capacity as an officer of the bank, but going beyond the scope of his intended duties, be personally liable for non-fraudulent but negligent conduct that does not cause personal injury but causes financial damage to a bank customer? Appellant relies for its argument on such cases as Korson v. Independence Mall I, Ltd., 595 So.2d 1174 (La.App. 5th Cir.1992). That case held merely that officers and directors of a corporation are not personally liable in damages for corporate conduct when it is not alleged that they acted in any capacity other than as officers, employees, or representatives of the corporation.
Louisiana law is settled that if an officer or agent of a corporation through his fault injures another to whom he owes a personal duty, whether or not the act culminating in the injury is committed by or for the corporation, the officer or agent is liable personally to the injured third party, and it does not matter that liability might also attach to the corporation. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Hemphill, Etc. v. Davis Wholesale Elec., 516 So.2d 402 (La.App. 1st Cir. 1987), writ denied, 520 So.2d 751 (La.1988), appeal after remand, 555 So.2d 4 (La.App. 1st Cir.1989), writ denied, 558 So.2d 571 (La.1990).
In Canter v. Koehring, supra at 721, the following criteria are established for holding a corporate officer, director or employee individually liable to a third person:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
The trial court found in the present case that all four Canter v. Koehring *597 Company criteria had been satisfied. The court said in its reasons for judgment:
Plaintiffs established that they entered into a banking relationship with FNB and that a breach of that banking relationship, through the actions of Loyd, caused the damages which were suffered. FNB delegated the responsibility to Loyd to fun [sic] FNB's Agricultural Department in a reasonable and prudent manner. In the course of running that Department, Loyd went beyond the scope of his intended duties and began running plaintiffs' businesses.
In the course of running plaintiffs' businesses, Loyd assumed the personal obligation to plaintiffs to run their businesses properly and with the degree of care required by ordinary prudence under the same or similar circumstances. In breaching his duty to plaintiffs, Loyd caused plaintiffs to suffer damages. Plaintiffs have not sought to impose liability upon Loyd because of any technical or vicarious fault but only because of his own personal fault. Loyd personally caused the damages suffered by plaintiffs and plaintiffs are therefore entitled to recover against Loyd for the losses which they suffered as a consequence of his actions.
We find no manifest error in the trial court's conclusion that Loyd's conduct rendered him personally liable to each of the plaintiffs in this case.

SPECIFICATION OF ERROR NUMBER 2
National Union contends that the tort of negligent misrepresentation was not proved. We disagree.
Loyd himself thought he was an expert cattleman and merchant of cattle. The testimony made that clear. Many others, among them the plaintiffs, believed also that he was an expert.
The experts at the trial who were truly knowledgeable about cattle saw it otherwise. Although their opinions were bolstered by the advantage of hindsight, they roundly condemned his management of the plaintiffs' affairs.
Even when their debt increased and profits did not, the plaintiffs continued to trust Loyd. When they ventured a question, he would remind them of his superior knowledge and personal experience and reassure them: "Boys, we've been through this before."
The testimony was unanimous among the experts that the plaintiffs' losses were the result of Loyd's bad management.
Louisiana recognizes a cause of action for negligent misrepresentation as encompassed within La.C.C. Arts. 2315 and 2316. The circumstances which must exist for the doctrine to apply are these: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty; and (3) the breach must have caused damages to the plaintiff. Pastor v. Lafayette Bldg. Ass'n., 567 So.2d 793 (La.App. 3d Cir.1990).
We can perceive no error in the trial court's finding of fact that Loyd made numerous grave material misrepresentations of fact to the plaintiffs. His talent for convincing everyone that he had skills far beyond the ordinary cattleman was not the only misrepresentation that he made. The trial court found that he frequently represented his own demands and requirements as FNB's requirements to do business with the bank. He represented that the bank would allow the customers to do business only the way Loyd directed. The plaintiffs were led to believe that bank policy forbade financing cow-calf operations, but approved the financing of ryegrass calves and feed lot operations. They were also led to believe that it was bank policy that only an approved broker could buy and sell cattle, that the bank should specify the time to sell and the quantity of cattle to sell at a given time, that hedging was required, and that only certain feed lots were approved. Thus, he misrepresented the bank's policies as well as his own skills.
The trial court found that Loyd breached his duty to the plaintiffs and that they suffered damages as a result. We find no error in the holding that the estate was liable to the plaintiffs for negligent misrepresentation.

*598 SPECIFICATION OF ERROR NUMBER 3
The trial court also found that plaintiffs had a valid claim based on duress, and that the contracts between the plaintiffs and Loyd were voidable for that reason. The trial judge then ruled that the plaintiffs were entitled to recover all of their damages on that additional theory, including attorney's fees under La.C.C. art. 1964. National Union assigns the finding of duress and the award of attorney's fees as error. We agree.
Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation. La.C.C. art. 1959.
The trial court found that Loyd expressly or impliedly threatened plaintiffs with cutting off all working capital for their businesses if they resisted, and that each plaintiff feared severe economic deprivation if the suggestions of Loyd were not heeded. This was the duress found by the trial court. The trial judge believed that the threats of cutting off plaintiffs' credit was used to force them to go along with Loyd's demands.
It is an inconsistent finding to say, on the one hand, that the plaintiffs believed in Loyd's avowed and reputed abilities, and that they allowed him to manage their businesses for that reason, and, on the other hand, to say that they were forced to go along with his handling of their businesses under the threat of economic ruin if they did not do so.
There is clear error in the finding of duress, and we reverse the award of attorney's fees.

SPECIFICATION OF ERROR NUMBER 4
National Union claims that the plaintiffs' entire case against the Succession rests on inadmissible evidence, citing the Dead Man Statute, La.R.S. 13:3721-13:3722. Section 3721 prohibits parole evidence to prove the debt or liability of deceased persons, except under limited recited conditions. Section 3722 requires the testimony of at least one creditable witness other than the claimant, and other corroborating circumstances, when parol evidence is admissible.
The dead man's statute is not applicable to a tort action. Honeycutt v. Indiana Lumbermens Mutual Ins. Co., 130 So.2d 770 (La.App. 3d Cir.1961). The present case is a tort action.

SPECIFICATION OF ERROR NUMBER 5
National Union contends that the plaintiffs did not satisfy their burdens of proving that Loyd's conduct caused damages and the amount of those damages.
We quote the following from the trial court's reasons for judgment:
Plaintiffs have established that during the time period that Loyd ran their cattle businesses they suffered massive losses directly attributable to Loyd's negligent management. Plaintiffs have sufficiently established by a preponderance of the evidence that the following damages were suffered:

1. Cagle ............... $ 2,280,074.00
2. Johnson ............. $ 784,441.00
3. Methvin ............. $ 5,069,086.00
4. Young ............... $ 1,069,582.00
5. James ............... $ 4,035,632.00
6. Cole ................ $ 1,069,582.00

The above damages are a compilation of the loss of each plaintiff's net worth (each plaintiff lost virtually everything), plus the debt accumulated by each plaintiff in his cattle business as a consequence of the actions of Loyd.
The trial judge awarded as damages to the plaintiffs their loss of net worth and residual debt. When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La.C.C. art. 1999.
The record includes the testimony of Henry H. Cooper, a certified public accountant, who examined the commercial loan ledgers and summarized the cattle loans as to their quantity, the amount of interest paid, and the balance of the outstanding principal.
*599 After a review of the testimony and the exhibits filed in evidence, we cannot say that the awards were an abuse of the trial court's discretion. By awarding the residual debt, the trial court took into account the fact that the plaintiffs probably made money under some of Loyd's management decisions, but that they lost more money as a result of his mismanagement. This is probably the best decision that could be made considering the difficulty in reconstructing the financial picture over such a long period of time.
We likewise can find no abuse of discretion in the decision to use loss of net worth as a portion of the award. The net worth of each plaintiff was his net worth in 1983 or 1984, except for Cagle, whose net worth was from 1978, and the Coles, whose net worth was estimated by loss of assets in bankruptcy proceedings. Actually, these net worth figures are conservative considering that Loyd started making management decisions in the 1970's.
Leaving much discretion to the trial court, the award of damages based on lost net worth and residual debt appears to be a good approximation of the losses sustained by the plaintiffs as a result of Loyd's imprudent administration of their businesses.

SPECIFICATION OF ERROR NUMBER 6
National Union contends that it was error to fail to find plaintiff fault.
The case of Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), lists certain factors for determining plaintiff fault. The court first looked at the Uniform Comparative Fault Act, 2(b), which provides as follows:
In determining the percentages of fault, the trier of facts shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In the present case, the parties stood in a relation of trust and confidence. The plaintiffs accepted Loyd's opinions and recommendations. He held himself out as having special knowledge and understanding that they did not possess. After they accepted the very first decision that he made to move away from the familiar cow-calf operation, and into the unfamiliar ryegrass calves and feedlot operations, they became even more dependent on his supposedly superior knowledge. Among the reasons justifying their reliance on him, and their willingness to let him manage their businesses, was the fact that he did not profit personally from the management. If the plaintiffs were unjustified in their reliance on Loyd's representations, then they lose, not because they were contributorily negligent, but because one of the elements for proving this tort does not exist. Their reliance on Loyd, and continued faith in him, was explained for a number of reasons besides his ostensible experience and knowledge: he was their connection to the bank that held their notes and continued to increase their loans; he represented that the mounting losses were not related to business decisions but were caused by market changes; he reassured them by his experience-inspired conviction that they would ultimately win. In short, it was part of Loyd's apparent genius in the field of public relations that, the moment the slightest doubt in his abilities emerged, he could assuage it and renew the plaintiffs' trust and confidence in him, and their reliance on his authority. Such was his domination and control that the plaintiffs never knew that the cause of their problems was Loyd himself. This finding of fact is emphasized in the trial court's reasons for judgment. We cannot say that it was error for the trial court to find the plaintiffs were without fault.

SPECIFICATION OF ERROR NUMBER 7
The Succession filed an exception of prescription in its answer to the petitions. The trial judge overruled the exceptions. National Union filed its own exception in this court and makes prescription an issue on appeal.
The plaintiffs' relations with FNB began for some in the late '60's and for others in the early '70's. Their credit was terminated in the mid-'80's. Loyd retired (unknown to the plaintiffs) in 1986. He committed *600 suicide in April 1987. All suits were filed by June 1988.
The trial judge applied the doctrine of contra non valentem agere nulla currit praescriptio. The trial judge made detailed findings in support of the application of this doctrine. He applied the prescriptive period for the tort claim of negligent misrepresentation of one year from discovery of the existence of the cause of action. The trial judge concluded that Loyd's misrepresentations were not discovered or reasonably discoverable until his suicide produced a serious inquiry into what he had done and the depositions of bank officials were taken. His reasons for so ruling are quoted now:
Defendant has also asserted the affirmative defense of prescription and has alleged that plaintiffs' claims founded in negligence have prescribed through the passage of one year from the date injury or damage was sustained by plaintiffs. The Court finds that plaintiffs' claims against Loyd have not prescribed for several reasons. First, the actions of Loyd did not cause plaintiffs to sustain damages until Loyd retired from FNB and later took his own life as the magnitude of the plaintiffs' losses became evident to the bank, to Loyd, and eventually to the plaintiffs. Up until that time, using promissory notes signed in blank and completed by Loyd, all of plaintiffs' losses were simply rolled into additional loans advanced by FNB. The extent of, existence of and magnitude of the losses was not known to plaintiffs. Second, the doctrine of contra non valentem suspended the beginning of the prescriptive period because Loyd, through his domination and control of plaintiffs' businesses, prevented plaintiffs from discovering that they had causes of action to redress the wrongs committed by him. Plaintiffs did not know, and in the exercise of reasonable diligence, could not have known that causes of action were available to them.
The evidence adduced at trial demonstrated that due to the absolute and complete domination and control of plaintiffs' businesses by Loyd, Loyd prevented plaintiffs from discovering that claims existed to redress the wrongs committed by him. While Loyd was running their businesses, plaintiffs did not know and could not have known, in the exercise of reasonable diligence, that any damages which they had suffered were the result of Loyd's actions as opposed to market conditions. Contra non valentem acts to suspend the beginning of a prescriptive period when a defendant has done something to prevent a plaintiff from availing himself of his judicial remedies or when the cause of action is not discoverable by a plaintiff through the exercise of reasonable diligence. Plaquemine[s] Par. Com'n Council v. Delta Dev., 502 So.2d 1034 (La.1987); Frey v. Amoco Production Company, 943 F.2d 578 (5th Cir. October 7, 1991); Edmundson v. Amoco Production Company, 924 F.2d 79 (5th Cir.1991). The Court specifically finds that contra non valentem applies under the facts of this case and the beginning of the prescriptive period was suspended until Loyd's suicide precipitated inquiries and disclosures that finally revealed the nature and extent of his all-pervasive wrongdoing.
The evidence at trial demonstrated that the domination and control of plaintiffs' businesses by Loyd was so complete that plaintiffs could do nothing to protect themselves from Loyd's actions. Loyd controlled each and every aspect of their cattle operations and never afforded plaintiffs any opportunity to either object to his actions or to extricate themselves from his clutches and those of FNB. Plaintiffs incurred massive and insurmountable debts to FNB and the Court finds that any objection to Loyd's actions would have resulted in immediate and certain financial ruin to each plaintiff. Macky James testified about the parable of the good young rancher and the bad young rancher which Loyd told at Macky's first meeting with Loyd at the bank. The good rancher did as Loyd said and prospered. The bad rancher disobeyed, had his credit cut off, and was destroyed.

*601 The law protects persons in the situation of plaintiffs and prescription therefore did not begin to run against plaintiffs until the conduct which prevented them from availing themselves of their judicial remedies had ceased. The evidence demonstrated that once Loyd's conduct ceased, plaintiffs investigated their claims and then timely filed suit.
Additionally, due to the manner in which Loyd dominated and controlled plaintiffs' businesses, the Court also finds that plaintiffs had no reason to believe, even through the exercise of reasonable diligence, that the actions of Loyd had caused them anything other than market fluctuation damage until after Loyd's actions had ceased. Until plaintiffs became aware that Loyd had no special skills or abilities to assist them in the running of their cattle businesses, plaintiffs reasonably assumed that any losses they were suffering in their businesses were the result of market conditions unrelated to Loyd. Once Loyd ceased running their businesses, however, plaintiffs investigated and determined that the losses which they had suffered were directly attributable to the negligent management by Loyd. Plaintiffs thereafter filed suit and their claims are timely as prescription did not begin to run until after their claims against Loyd became knowable through the exercise of reasonable diligence.
Prescriptive statutes are to be strictly construed against prescription and in favor of the obligation sought to be extinguished; of two possible constructions, that which favors maintaining, as opposed to barring an action should be adopted. Bustamento v. Tucker, 607 So.2d 532 (La.1992).
The findings of fact on which the trial judge based his decision must be accorded the "clearly wrong" standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The recent case of Bustamento v. Tucker, supra, was a sexual harassment case. The issue before the Supreme Court was prescription. The resolution of that issue hinged upon a determination of whether each of the alleged incidents of harassment constituted a separate cause of action, with prescription running from the date of each separate incident; or whether the entire course of harassment constituted a single cause of action, with prescription running from the date of the last incident or abatement of the course of conduct. To make that determination, according to the court, it had to first analyze the nature of the claim the plaintiff sought to enforce. The claim before it was an action for intentional infliction of emotional distress in a workplace environment. The court held that when such a claim is based on a cumulation of acts and conduct, and the resulting cumulation of damages, it is the "continuous, cumulative, synergistic nature" of the acts and conduct that transforms the individual incidents of harassment into an actionable tort. In such cases prescription does not commence until the last act occurs or the conduct is abated. In Ms. Bustamento's case, the last individual incident of sexual harassment occurred more than a year before suit was filed. However, an act (a cursing) occurring less than a year before suit was filed, though not in and of itself actionable, was an act in furtherance of the continuing pattern of harassment, and the case was not prescribed when suit was filed.
We find that Loyd's conduct and the damages that his conduct caused was similarly continuous, cumulative, and synergistic. While the trial court's findings of fact were handed down well before Bustamento v. Tucker was decided, his findings fit the mold of that case.
According to the testimony, the first incident that alerted the plaintiffs that Loyd might be their problem was in January 1987 when a representative of the bank went to the James residence to seek payment of their "astronomical" debt. It was then that they learned that Loyd was no longer at the bank. Three months later the shocking news of Loyd's suicide reached them. The plaintiffs contended and the trial judge found that, until these events occurred, the plaintiffs had no knowledge or reason to believe that Loyd was in any *602 way responsible for their huge debts. All of the plaintiffs testified that they were repeatedly told that it was the market that caused their losses and that the next year the market would improve and everything would be all right. Since Loyd made the plaintiffs sign blank notes and had their payments sent directly to the bank to be applied at his discretion, there was no way for them to know that anything other than his explanation of market fluctuations was causing their mounting debt.
The trial judge did not find a precise date on which Loyd's conduct and the damages caused by that conduct abated, or when the plaintiffs acquired their knowledge that it was his conduct and not the market that caused their losses. He merely concluded that it was within a year from the time the last suit was filed. His conclusion is supported by the deposition testimony of the chairman of the board of the bank in July 1988, and the testimony of another of the bank's officers, which denied that Loyd lacked expertise and which asserted that he had not done anything improper. They specifically denied at that time that he ran his customer's businesses, but admitted that running customers' businesses would be a serious violation of bank policy. We find no error in the trial court's ruling regarding the issue of prescription.
Before leaving the subject of prescription, we note that there is insufficient evidence in the record to establish the date when the Cole suit was filed. The Cole brief states that it was filed in 1988. The first suit record in the volume of pleadings pertaining to the Cole suit indicates a filing date of July 1, 1991. The Cole case was transferred from Caddo Parish to Natchitoches Parish in the same transfer order with the other five cases, and the transfer took place on July 1, 1991. Therefore, we assume that the brief is correct, and that the initial Cole petition, like the other cases, was filed in 1988. Since we are remanding the Cole case for other purposes, the Coles can put in evidence the proof of their filing date on remand.

EXCEPTION OF NO RIGHT OF ACTIONCOLE CLAIMS
National Union on appeal has filed the peremptory exception of no right of action as to the Cole claims on account of certain bankruptcies. John B. Cole and Tina M. Cole, and James L. Cole, Jr., concede that there are grounds for sustaining the exception, as to part of the award, but request that we remand the matter for the substitution of the trustee in bankruptcy as the proper party plaintiff. The remaining non-bankrupt Cole plaintiffs request that we separate their claims from those of the bankrupt plaintiffs, and render judgment for them.
This court must render any judgment which is just, legal, and proper upon the record on appeal. La.C.C.P. art. 2164. We note, first, that the trial court, in both its reasons for judgment and in the judgment itself, recited the amount of the award to the Coles as $1,690,582. This amount was conceded by the Coles in their brief to be error. The correct amount is $762,000. The separate judgment which we will render in their case will correct that error.
Of the $762,000 making up the judgment, $648,000 was recited in the summary of damages as "other related debt and bankruptcy." The bankruptcies of John B. Cole and Tina M. Cole, and James L. Cole, Jr., accounted for $512,769.91. The "other related debt," of $135,230.09, not related to the bankruptcies, along with the $50,000 loss of net worth of James L. Cole, Jr., (a total of $185,230.09) belong to the non-bankrupt Cole plaintiffs. We will render judgment in favor of the non-bankrupt Cole plaintiffs in this latter amount, in the separate decree in the Cole case which we will render this date. We will sustain the exception of no right of action, as to the bankrupt Coles, but remand to the trial court with instructions to order an amendment within a delay to be granted by the trial court, for the substitution of the trustee in bankruptcy, as plaintiff, in the place of the bankrupt Coles.
On remand the Coles shall also put on evidence establishing the 1988 date of the filing of their petition.

*603 JUDGMENT IN THE CAGLE CASE
For the foregoing reasons, the judgment in favor of the plaintiffs, Charles F. Cagle and Inez Cagle, and against the defendant, the Succession of Jess Loyd, Jr., in the amount of $2,280,074, together with legal interest thereon from date of judicial demand until paid, and costs below and on appeal, is affirmed.

THE CONSOLIDATED CASES
For the reasons given in the above and foregoing opinion, separate judgments are this date rendered in Johnson v. Succession of Loyd, 617 So.2d 603 (La.App. 3d Cir.1993); in Methvin v. Succession of Loyd, 617 So.2d 603 (La.App. 3d Cir.1993); Young v. Succession of Loyd, 617 So.2d 604 (La.App. 3d Cir.1993); James v. Succession of Loyd, 617 So.2d 604 (La.App. 3d Cir.1993); and Cole v. Succession of Loyd, 617 So.2d 605 (La.App. 3d Cir.1993).
AFFIRMED.