**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 94-40648
_____


NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA.,

Plaintiff-Consolidated-Counter-Claimant-Appellant/Cross-Appellee,

VERSUS


CHARLES F. CAGLE, ET AL.,

Defendants-Consolidated   Counter-Defendants-Appellees/Cross-Appellants.

* * * * * * * * *

CHARLES F. CAGLE, ET AL.,

Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,

versus

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA,

Defendant-Counter-Claimant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Western District of Louisiana
_____

November 7, 1995

Before JOLLY, DAVIS, and EMILIO M. GARZA, Circuit Judges.

DAVIS, Circuit Judge:

In this diversity case, the appellant, National Union, appeals a district court declaratory judgment that appellant's insurance policy afforded coverage for a loss which was reduced to judgment in a Louisiana court by appellee, Cagle, et al. In a cross-appeal, the appellee challenges the district court's judgment exonerating

National Union from any obligation for penalties. We affirm the district court's judgment in all respects.

I. Facts

Appellant National Union Fire Insurance Company of Pittsburgh ("National Union") issued directors and officers liability and corporation reimbursement insurance policies (the "D&O policies") to First National Bank of Shreveport ("FNB"). Mr. Jess Loyd, Jr., was a senior vice-president and supervisor of the agricultural lending department of FNB for 37 years until his suicide in 1987. Mr. Loyd was an insured under the D&O policy. The appellees (the "Cattlemen") are six families in the cattle ranching business and were customers of FNB since 1970. Mr. Loyd handled all of the Cattlemen's loans and other financial transactions with the bank. The Cattlemen were persuaded by Mr. Loyd to change their mode of operation from a traditional cow-calf, low-risk operation into a speculative, high-risk operation. Over the years, the Cattlemen sustained high losses and became more and more dependant on Mr. Loyd to provide loans to cover their losses. The Cattlemen alleged Mr. Loyd took advantage of his position at the bank and their vulnerability by requiring them to buy cattle and supplies at inflated prices from third parties who gave kickbacks to Loyd.

In 1987 and 1988, the Cattlemen filed a series of lawsuits (the "lender liability suits") in Louisiana state courts against FNB, alleging claims of duress, negligent misrepresentation, domination and control, breach of fiduciary duty, and fraud. The Succession of Loyd (the "Succession") was named as a co-defendant

2

in two of these suits. Concurrently, in Spring, 1988, the Cattlemen filed a second series of suits against the Succession in Caddo Parish (the "Caddo Parish suits"), alleging personal liability of Mr. Loyd due to fraud and self-profiteering.[1] In the Caddo Parish suits, the Succession filed third-party claims against FNB. Mr. John Cox represented FNB in both the lender liability and Caddo Parish suits. He notified all insurers, including National Union, of the claims against FNB and the Succession and forwarded the insurers copies of the pleadings.

The National Union policy had three clauses that caused National Union to pay little attention to this litigation. First, under the policy National Union had no duty to defend either FNB or the Succession. As a result National Union's counsel was not defending either insured. Second, the policy afforded no coverage for losses arising from acts of fraud or willful misconduct, as was alleged in the pleadings. Finally, the policy had a no-action clause which, at that time, protected the insurer from a direct action under the Louisiana Direct Action Statute before a judgment was rendered against the insured.[2]

---

[1]Under Louisiana law unless the Succession waived venue, the Cattlemen had to sue the Succession in Caddo Parish where the Succession had been judicially opened. See La. Code C. Pr. art. 81.

[2]Subsequently, the Louisiana Supreme Court ruled that the Direct Action Statute, La. R.S. 22:655, overrides such policy provisions. Quinlan v. Liberty Bank & Trust Co., 575 So. 2d 336 (La. 1991). In fact, National Union could have been sued under this ruling in July, 1991, when the Caddo Parish suits were amended, consolidated and moved to Natchitoches Parish. The Direct Action Statute, however, gives the Cattlemen the choice of suing only the insured or both the insured and his insurer.

3

The Cattlemen settled the lender liability suits against FNB in September, 1988, but reserved their rights against the Succession and FNB's insurers. As a condition to the settlement, the Cattlemen agreed to get the Succession to drop the third-party claims against FNB in the Caddo Parish suits. In a letter dated December 9, 1988, Mr. Cox informed National Union that FNB had settled its uninsured liability with the Cattlemen, that FNB was no longer a party in the state court suits, and that the Cattlemen planned to pursue all insurers.

In an earlier letter to National Union dated August 24, 1988, Mr. Cox had reported that the Cattlemen and the Succession had reached a settlement accommodation which included an obligation of the Succession to deliver to the Cattlemen all the records of Jess Loyd, Jr. Actually, the Succession did not enter into a written agreement with the Cattlemen until December, 1988, and January, 1989. In the settlement instrument (termed a "nonrecourse" or "forbearance" agreement), the Succession agreed to waive any objection to the Cattlemen combining all suits in Natchitoches Parish, to provide relevant information to the Cattlemen without need for formal discovery, and to dismiss the third-party claims against FNB. The Cattlemen, in exchange, agreed to seek no further recovery from the Succession but rather to limit their recovery to available insurance. In addition, the parties agreed to limit the expenditures of the Succession and the Loyd family in defending the Cattlemen's claims at court. When this agreement was made, National Union had not contacted the Succession, and the Succession did not inform National Union of the agreement.

4

In July, 1991, the Cattlemen obtained the necessary orders to transfer all of their state court actions against the Succession to Natchitoches Parish. At that time, the Cattlemen amended their petitions to delete claims predicated on fraud, duress, and other intentional acts. Following the amendments, their petitions stated only claims flowing from negligence and domination and control, which were not excluded by the terms of National Union's D&O policy. On August 29, 1991, Mr. Bobby Gilliam, counsel for the Succession, notified National Union of the transfer of venue and sent copies of the amended petitions. National Union received this letter on October 2, 1991. At this time, National Union did not contact Gilliam, but did forward his letter to their counsel, D'Amato & Lynch. Not hearing from National Union, Mr. Gilliam sent a second letter on November 10, 1991. National Union still did not respond.

On December 16, 1991, a bench trial was held on the merits of the Cattlemen's negligence claims against the Succession. National Union was not informed of the trial date. On the morning of the trial, one of Mr. Gilliam's associates appeared for the Succession and filed an answer, but declined to give opening or closing statements or to examine witnesses. The Cattlemen called twelve fact and three expert witnesses to establish Loyd's negligence and the Cattlemen's damages. At the conclusion of the trial, the court awarded the Cattlemen $14,308,397.00, plus interest, costs, and attorney's fees, and apportioned fault between FNB and Loyd as 10% and 90%, respectively. On December 20, 1991, the Cattlemen's

counsel forwarded a copy of the judgment to National Union and demanded payment.

National Union contacted Mr. Gilliam for the first time in February, 1992, requesting information about the trial. National Union intervened in March, 1992, to devolutively appeal the judgment. The judgment was affirmed by a Louisiana intermediate appellate court and writs were denied by the Louisiana Supreme Court. Cagle v. Loyd, 617 So. 2d 592 (La. App. 3d Cir.), writ denied, 620 So. 2d 877 (La. 1993). National Union subsequently filed an action in state court seeking to nullify the judgment based on evidence of fraud or ill practices in obtaining the judgment. That suit is pending in state district court after a summary judgment for the Cattlemen was reversed by a Louisiana appellate court. National Union Fire Ins. Co. v. Cagle, 649 So. 2d 642 (La. App. 3d Cir. 1994), writ denied, 651 So. 2d 266 (La. 1995).

In February, 1992, National Union filed a declaratory judgment action in United States District Court seeking a determination that the state court judgment was not within the coverage of National Union's D&O insurance policy. In March, 1992, the Cattlemen filed a supplemental petition against National Union in state court seeking to collect the judgment and to assert a bad-faith claim for penalties under La.R.S. 22:1220.[3] National Union removed this suit

---

[3]La. R.S. 22: 1220 provides in relevant part:

(A) An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insured who breaches these duties shall be liable

to federal court and the district court consolidated this action with the declaratory judgment action. National Union then amended the declaratory judgment complaint to assert a state law nullity claim. The district court stayed the nullity claim pending resolution of the parallel state court nullity action.

Prior to trial, the district court granted summary judgment in favor of the Cattlemen on a number of National Union's policy coverage defenses.[4] The principal issues that remained to be tried

for any damages sustained as a result of the breach.

(B) Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A.
. . . .
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

(C) In addition to any general or special damages to which a claimant is entitled to for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.

[4]The district court found in favor of the Cattlemen and concluded that coverage would not be precluded under the following policy provisions:
1) Provision (7b) which excludes coverage if proper notice of the claim is not given could not be solely used to destroy coverage since National Union was informed of the claims, though evidence of notice might be relevant on the collusion issue.
2) Provision 4(n) which excludes coverage when the insured is entitled to indemnification from the company does not apply, since under the applicable corporation articles of FNB, the Succession was only entitled to indemnification from FNB to the extent that the insurance policy did not cover.
3) Provision 4(a) which excludes coverage when the claim resulted from a finding of personal profit, gain or advantage does not apply since the underlying state court proceeding did not make such a finding.
4) Provision 4(d) which excludes coverage when the claim is brought about by fraudulent, dishonest or criminal acts of the insured also requires an adjudication of fraud in the underlying

were whether coverage was defeated by the conduct between the Cattlemen and the Succession that culminated in the state court judgment obtained by the Cattlemen and whether National Union breached a duty of good faith and fair dealing triggering penalties under the Louisiana statute. The district court bifurcated the coverage and bad faith issues for presentation to the jury. The jury first found the Cattlemen and Succession did not collude to obtain the state court judgment. The jury then found National Union had breached its duty of good faith and fair dealing and could be assessed penalties pursuant to La. R.S. 22:1220. National Union applied for judgment as a matter of law or, alternatively, a new trial. The district court upheld the jury's verdict on coverage but disagreed with the jury's determination of bad faith and <u>sua sponte</u> granted judgment as a matter of law in favor of National Union on the penalty issue. The court entered judgment accordingly and this appeal followed.

II. Discussion

National Union makes a number of arguments on appeal, two of which merit discussion:[5] (1) it was entitled to a new trial based

judgment and thus does not apply.
5) Exclusion # 15 which excludes performance of professional services for others does not apply since Loyd's actions were outside the course of his bank duties and no evidence of compensation for managing the Cattlemen's operations was presented.

[5]In addition to the issues discussed, National Union asserts the following errors of the district court: 1) refusal to bifurcate the issues of coverage and bad faith at an earlier point in the trial; 2) admission of evidence of National Union's alleged negligence in handling the claim; 3) refusal to allow National Union to examine the Cattlemen's counsel; 4) refusal to find

8

on errors in the instructions given to the jury; and (2) it was entitled to judgment as a matter of law either because the conduct of the Succession in failing to disclose the nonrecourse agreement or the date of trial was a breach of the insurance contract or because the evidence was insufficient to support the jury verdict of no collusion in obtaining the state court judgment. We also discuss below the Cattlemen's cross-appeal challenging the district court's denial of penalties and attorneys' fees.

A. Errors in Jury Instructions

National Union argues first that the district court erroneously declined to give its tendered jury instructions on the duty of the insured to the insurer and on the Louisiana definition of fraud. It also contends that the court's instructions on the legal status of the nonrecourse agreement and the state court judgment were erroneous.

To succeed in its challenge, National Union must satisfy a two-part test. First, National Union must demonstrate that the charge as a whole creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." Bender v. Brumley, 1 F.3d 271, 276 (5th Cir. 1993) (citations omitted). "In the review of jury instructions, a challenged instruction should not be considered in isolation but rather as

_____

National Union an indispensable party to the state court action; 5) refusal to credit the settlement of the Cattlemen and FNB to the state court judgment; 6) refusal to find no coverage based on the "professional services" exclusion of the D&O policy; and 7) refusal to limit coverage liability to the 1986-1987 D&O policy. We have considered these issues and, for reasons given by the district court, find no merit in them.

9

part of an integrated whole.  If, viewed in that light, the jury instructions are comprehensive, balanced, fundamentally accurate, and not likely to confuse or mislead the jury, the charge will be deemed adequate."  Scheib v. Williams-McWilliams Co., 628 F. 2d 509, 511 (5th Cir. 1980).  Second, even if the jury instructions were erroneous, we will not reverse if, based upon the entire record, the "challenged instruction could not have affected the outcome of the case." Bender, 1 F.3d at 276-77, quoting Bass v. United States Dept. of Agriculture, 737 F.2d 1408, 1414 (5th Cir. 1984).  In considering whether the district court erred in refusing to give National Union's proffered instruction, the threshold question is whether the proffered instruction is a correct statement of the law.  Treadway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 167 (5th Cir. 1990).

National Union's principal argument on this issue is that the district court erred in refusing to instruct the jury that the Succession owed a duty of "utmost candor and good faith" to National Union.  National Union relies on two Louisiana circuit court cases to support this argument.  In Miller v. Lumbermens Mutual Casualty Company, 488 So. 2d 273 (La. App. 2d Cir. 1986), writ denied, 493 So. 2d 637 (La. 1986), an insured sued his auto insurer for repair costs after an accident.  The insurer offered to pay the actual cost of repair.  The insured based his demand on two higher estimates.  The insured argued that the higher value was owed under the policy because the actual repair was inadequate and incomplete.  The trial court assessed the cost of repair at an intermediate value and ordered the insurer to pay not only the

10

repair costs, but also penalties and attorney's fees. The trial court based this award of penalties and attorney's fees on a belief that the insurer had breached its fiduciary duty by not investigating further the costs of adequate repair. The appellate court reversed. The court disagreed that a fiduciary duty was owed to the insured and stated: "[T]he contract of insurance created no fiduciary relationship between these parties nor did the facts of this case indicate such a relationship. There was a bilateral contractual relationship between them, but no fiduciary relationship." Id. at 278. The court then expanded on the relationship between an insurer and its insured and found there was "an obligation in this contract insurance on the part of both [parties] . . . to deal with each other 'uberrimae fidei', that is an absolute perfect candor and good faith, but there was no trust or fiduciary relationship by either party." Id. at 278, quoting 42 AM JUR. 2d Insurance Section 159 (1982) at page 242.

In Ray Gibbins Certified Welders v. Griggs, 543 So. 2d 68 (La. App. 1st Cir. 1989), the insured paid insurance premiums to an insurance broker who agreed to remit the funds to a general insurance agent. The general agent had formulated an insurance plan for the insured and was to ultimately pay the insurance carriers. The insurance broker fraudulently kept the insured's money and the coverage was never obtained. The insured sued the broker, the general agent, and the insurance carriers. The insured argued that the general agent had breached its fiduciary duty to the insured. The appellate court disagreed and held that the

11

contract of insurance created no fiduciary relationship between these parties, quoting the above language from Miller.

The primary holding in both of these cases is that no fiduciary relationship is established by an insurance contract. Significantly, no other Louisiana court has adopted the language relied on by National Union that an insured owes his insurer an enhanced duty of utmost candor and good faith.

To the contrary, the Louisiana Supreme Court recently made it clear that insurance policies are generally governed by the same rules as other types of contracts. Louisiana Ins. Guar. Assn. (LIGA) v. Interstate Fire & Casualty Co., 630 So. 2d 759, 763-64 (La. 1994). "An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." Id. at 763. In LIGA, the Louisiana Supreme Court emphasized that the insurance contract controls the obligations of the parties. "Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume." LIGA, 630 So. 2d at 763 (omitting citations). When "the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." Id. at 764.

Because the insurance contract is governed by the general rules of contracts, the underlying duty of the parties to each other in performance of the contract is controlled by the Louisiana Civil Code. The Louisiana Civil Code states "[c]ontracts must be

12

performed in good faith."  La. Civ. Code art. 1983.  The Civil Code, however, does not define "good faith," but does define "bad faith" as "an intentional and malicious failure to perform."  La. Civ. Code Ann. art. 1997 cmt. c.  Louisiana courts have looked to this definition of "bad faith" for guidance in determining conduct that breaches the duty of good faith.  See, e.g., <u>Great Southwest Fire Ins. Co. v. CNA Ins. Cos.</u>, 557 So. 2d 966, 969 (La.1990); <u>Heirs of Gremillion v. Rapides Parish Police Jury</u>, 493 So. 2d 584, 587 (La. 1986); <u>American Bank & Trust of Coushatta v. FDIC</u>, 49 F.3d 1064, 1066 (5th Cir. 1995).  "[A] breach of contract occurs if contractual discretion is exercised in bad faith, a term connoting fraud, deception or sinisterly-motivated nonfulfillment of an obligation." <u>Adams v. First National Bank of Commerce</u>, 644 So.2d 219 (La. App. 4th Cir. 1994).  In contrast to the general duty of good faith, we recognize that Louisiana courts have implied a higher duty on the <u>insurer</u> in performance of its policy obligation of the duty to defend the insured against covered claims, including a consideration of the interests of the insured in every settlement.  <u>Pareti v. Sentry Indemnity Co.</u>, 536 So.2d 417, 423 (La. 1988).

Thus, we agree with the district court that the obligations of the Succession to National Union are governed by the policy terms. We also agree with the district court that the Succession's duty of good faith in the performance of its obligations under the contract is not enhanced because this is an insurance contract.  The requested jury instruction was properly denied.

This brings us to National Union's next argument that the collusion instruction as given to the jury was improper.[6] National Union requested that the Louisiana definition of fraud be included in this instruction.[7] It argued that the court's collusion instruction required a finding of "deceitful" or "evil" intent, while Louisiana law on fraud required less. We do not agree with National Union's interpretation of the district court's jury instruction. The district court's instruction defined collusion in three ways. The instruction does not require the jury to find deceit to conclude that fraud was committed. Moreover, National Union's requested jury instruction on fraud presents an incomplete

---

[6] The district court gave the following instruction on collusion:

Collusion has been defined in several ways:
1. A deceitful agreement between two or more persons, for one party to bring an action against the other for some evil purpose, such as to defraud a third party of its rights;
2. A secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third party or to obtain that which justice would not give them, by deceiving a court or its officers; or
3. A secret combination, conspiracy or concert of action between two or more persons for fraudulent or deceitful purposes.
National Union has the burden of proving by a preponderance of the evidence that the procurement of the state court judgment against the Succession was obtained through collusion between the Succession and the Cattlemen. What constitutes collusion will differ with each fact situation.

[7] National Union requested the following definition of fraud, taken from the Louisiana Civil Code:
Fraud is a misrepresentation or a suppression of the truth made with intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
La. Civ. Code art. 1953.

14

statement of Louisiana law.[8] We agree with the district court that an additional instruction on the meaning of fraud was not necessary to aid the jury and, in fact, would have led to heightened confusion in an already complicated case. The collusion instruction, when viewed as a whole, was not inadequate or confusing.[9]

National Union complains next about the district court's instruction to the jury that the nonrecourse agreement between the Succession and the Cattlemen was not "on its face" improper.[10] Relatedly, in the same jury instruction, National Union complains of the statement that the state court trial was "on its face" an actual trial. We find no error in these statements of the law. Each statement was qualified by the language "on its face," leaving

---

[8]La. Civ. Code art. 1954 further elaborates on when fraud will negate consent in a contractual obligation:

> Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
> This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations.

La. Civ. Code art. 1954.

[9] In fact, the jury instructions on collusion were taken from an earlier memorandum submitted by National Union.

[10] The complete jury instruction provided:

> In deciding whether or not collusion existed between the Succession of Loyd and the Cattlemen, you are instructed that the agreement entered into between the Cattlemen and the Succession is, on its face, not an improper act. You are further instructed that the state court trial which took place in Natchitoches Parish between the Succession and the Cattlemen was, on its face, an actual trial which resulted in a valid judgment against the Succession of Loyd. It is for you to decide whether or not that judgment is collectable against National Union.

the jury free to determine that, under all the circumstances, this agreement and this judgment were collusive.

B.   Breach of the Insurance Contract

National Union argues next that the Succession's conduct was an absolute coverage defense.  It contends that the Succession's failure to disclose the existence of the nonrecourse agreement and the date of the trial was either a breach of its duty of good faith and candor or a breach of the cooperation clause of the insurance contract.

National Union argues that the duty of good faith and utmost candor imposes an affirmative obligation on the Succession to communicate candidly without first being asked.  As discussed above, the insured owes the insurer the duty of complying with the contract terms together with a general duty of performance in good faith.  The insured does not owe the insurer a fiduciary obligation -- a higher duty that may indeed impose an affirmative duty to disclose facts beyond that required by the contract.  See, e.g., FDIC v. Duffy, 47 F.3d 146, 152 (5th Cir. 1995) (fiduciary duty owed by a partner to the partnership to disclose true interests in business deal); Pitre v. Pitre, 172 So.2d 695 (La. 1965) (fiduciary duty owed by husband to wife to disclose assets in partition agreement).   In an insurance contract, the insured's duty to provide information ordinarily arises only under the express policy obligations.

The cooperation clause, clause 7(e), states that "[t]he insureds shall give the insurer such information and cooperation as

16

it may reasonably require and shall be in the insureds' power."
National Union asserts the Succession breached this clause
regardless of whether National Union requested the information.
Under Louisiana law, however, before proving a breach by the
insured of the cooperation clause, the insurer must show a diligent
effort to obtain the information.  Pelas v. American Employer's
Ins. Co., 299 So. 2d 815 (La. App. 4th Cir.), writ denied, 302 So.
2d 310 (La. 1974); Lindsey v. Gulf Ins. Co., 7 So. 2d 757 (La. App.
2d Cir. 1942).  In addition, even if a breach of the cooperation
clause could be shown by National Union, under the Louisiana Direct
Action Statute, this breach would not affect the Cattlemen's
rights, as a third-party claimant, to the proceeds of National
Union's policy, absent fraud or collusion.  King v. King, 217 So.
2d 395, 400 (La. 1968); Futch v. Fidelity & Casualty Co., 166 So.
2d 274, 278-79  (La. 1964).

We agree with the district court that the failure of the
Succession to furnish information not requested by National Union
did not as a matter of law constitute a breach of the insurance
contract.

C. Sufficiency of Evidence

National Union argues next that the evidence is insufficient
to support the jury's finding of no collusion between the
Succession and the Cattlemen and that the district court erred in
refusing to grant judgment as a matter of law.  We review all the
evidence bearing on this issue and draw all inferences in favor of
the verdict.  Using this standard, if a reasonable juror could have

17

found no collusion, we must affirm. McNair v. City of Cedar Park, 993 F. 2d 1217, 1219 (5th Cir. 1993).

National Union contends that the Succession and Cattlemen colluded to prevent National Union from knowing about the nonrecourse agreement or from participating in the state court proceeding. In support of its claim, National Union cites the following facts: (1) the Succession entered into a nonrecourse agreement with the Cattlemen with the advance knowledge that there would be a trial and the resultant judgment could only be collected against National Union; (2) the Succession never informed National Union about the agreement; (3) the Succession never informed National Union of the trial date; (4) the Succession never intended to defend the Cattlemen's suits; and (5) the Gilliam letter, giving notice of the amended claims, was carefully drafted by the Cattlemen to avoid alerting National Union that it should assume an active role in the litigation.

On the other hand, the Cattlemen contend that the jury was entitled to find that the Succession fulfilled its obligations to National Union and was entitled to take action to protect its own interests. The Cattlemen argue that no collusion or conspiracy existed between the Cattlemen and the Succession and that National Union's ignorance of the nonrecourse agreement and the trial date was due to its own negligence. In support of this argument, the following evidence was submitted to the jury: (1) The Succession (or the bank) gave National Union notice of the suits instituted against the Succession as required by the policy; (2) the policy imposed no duty to defend on National Union and the Succession was

18

required to mount the best defense possible with the meager funds available to it; and (3) although National Union knew that the Succession and the Cattlemen were discussing settlement, National Union never requested any information about the settlement from the Succession; and (4) in November 1990, counsel for National Union actively discussed the likelihood of a settlement between the Cattlemen and the Succession in light of the amendments to the Cattlemen's complaint deleting the claims not covered by the policy.

Reviewing the evidence in a light favorable to the verdict, a jury was entitled to find that the Succession did not collude with the Cattlemen but acted appropriately to defend against the Cattlemen's lawsuit. The nonrecourse agreement was not illegal and was, in fact, approved by a state court in the Succession proceeding. The Succession had no affirmative duty under the insurance contract to inform National Union of the nonrecourse agreement or the trial date in the absence of a general request by National Union for such information. The evidence does not compel a finding of fraudulent or deceitful conduct on the part of the Succession or the Cattlemen as a matter of law. The district court correctly denied National Union's post-judgment motion for judgment as a matter of law and for new trial.

D. Assessment of Penalties under Louisiana Law

The Cattlemen challenge the district court's judgment as a matter of law, reversing the jury's finding that National Union had breached its duty of good faith and fair dealing. We review the

19

district court's ruling by viewing the evidence in the light most favorable to the Cattlemen.  We sustain the judgment only if we find "that on all the evidence no reasonable juror could arrive at a verdict contrary to the district court's conclusion."  Allied Bank-West, N.A. v. Stein, 996 F.2d 111, 114 (5th Cir. 1993).

Louisiana R.S. 22:1220(A) "grants third-party claimants a right of action when an insurer violates its duty of good faith and fair dealing."  Midland Risk Ins. Co. v. State Farm Mutual Auto Ins. Co., 643 So. 2d 242, 243 (La. App. 3d Cir. 1994), citing Romero v. Gary, 619 So. 2d 1244 (La. App. 3d Cir. 1993).  To recover penalties under this statute, the claimant must prove that the insurer received adequate notice of the loss and that the insurer acted in bad faith in refusing to pay.  Romero, 619 So. 2d at 1247-48.  "There must be a showing that the insurer's actions or failure to act were unjustifiable.  Whether an insurer's refusal to pay a claim is arbitrary, capricious, or without probable cause, warranting imposition of statutory penalties and attorney's fees, depends on the facts known to the insurer at the time of its action." Id. at 1247.

At the time it refused to pay the Cattlemen, National Union knew the following:  (1) the allegations against the Succession had been changed from fraud and self-profiteering, which were not covered under the D&O policy, to negligence, a covered act;  (2) the existence, if not the substance, of an agreement between the Cattlemen and the Succession; (3) the refusal of the Succession's lawyer to actively defend at the state court trial; and (4) the Succession did not advise National Union of the state court trial

20

date.  National Union was not arbitrary in denying coverage.  It had plausible arguments of no coverage either under a policy exclusion or a collusion theory.  Even viewing the evidence in a light most favorable to the Cattlemen, we find no reasonable juror could find National Union acted arbitrarily, capriciously, or without probable cause in refusing payment.

IV.  Conclusion

For reasons stated above, the judgment of the district court is in all respects AFFIRMED.