653 So.2d 158 (1995)
A & W SHEET METAL, INC., Plaintiff-Appellee,
v.
BERG MECHANICAL, INC. & River City Sheet Metal, Inc., Defendants-Appellants.
No. 26799-CA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1995.
*160 Katherine Clark Hennessey, Shreveport, Donald J. Anzelmo, Monroe, for appellant.
Paul J. Verlander, Monroe, for appellee.
Before NORRIS and HIGHTOWER, JJ., and CULPEPPER, J. Pro Tem.
CULPEPPER, Judge Pro Tem.
Appellant Berg, Inc.[1] (Berg) challenges a judgment in favor of A & W Sheet Metal, Inc. (A & W) awarding damages for breach of contract and loss of business reputation. A & W appeals from that portion of the judgment denying its claims of unfair trade practices against Berg and River City Sheet Metal, Inc. (River City) as well as its claim of intentional interference with contract against River City.

FACTS
This is a bidding process dispute.
In mid-1990, State Farm Insurance Company (State Farm) planned to build a substantial addition to its office in Monroe, Louisiana. State Farm issued a request for bids on the project in June; the final bid deadline for general contractors was 2:00 p.m. on July 27, 1990. McInnis Brothers (McInnis), a Minden general contractor, submitted the lowest bid and was chosen to build the addition.
Berg submitted bids on the mechanical subcontract to several general contractors, one of whom was McInnis. Berg's bid was lowest among the mechanical contractors bidding with McInnis and Berg was selected to perform this portion of the work.
The instant dispute concerns the award of the subcontract to provide Berg with sheet metal duct-work for the project. Before submitting its bid to the general contractors, Berg solicited bids from several sheet metal subcontractors by telephone. When the 2:00 p.m. bid deadline for general contractors passed on July 27, Berg had received only two bids for the sheet metal workthose of A & W ($514,000.00) and Industrial Roofing and Sheet Metal, Inc. (Industrial) ($568,000.00). About one hour before the deadline, Berg called River City for a bid but was unable to reach them. Berg submitted its bid to McInnis using the $514,000.00 figure for the metal work.
At approximately 2:17 p.m. on bid day, Ricky Auttonberry (the president of A & W) called Berg to determine the outcome of the bidding. Chris Colvin, Berg's vice-president in charge of operations, told Auttonberry that McInnis had submitted the lowest bid among general contractors, that Berg had submitted the lowest mechanical subcontract bid to McInnis, and that A & W had submitted the lowest sheet metal subcontract bid to Berg. Colvin then told Auttonberry that Berg had calculated its mechanical subcontract bid using A & W's price.
Colvin later spoke to a representative of Industrial and told that company that Berg had "committed to A & W, that they were low."
At about 2:30 p.m. on bid day, a River City representative called Berg and got permission to submit a late bid. At 4:00 p.m., River *161 City gave Berg a bid of $419,000.00 to perform the sheet metal work. By that time, the various subcontractor bids were no longer confidential, and River City may have known the approximate amount of A & W's sheet metal bid to Atkins, a competitor of Berg. The trial court was uncertain whether River City knew the amount of A & W's bid to Berg.
In early August, Auttonberry called Berg to check on the progress of the job. He again spoke to Colvin, who told Auttonberry that when McInnis picked its project manager, Berg would select its project manager who in turn would contact A & W. Colvin told Auttonberry that A & W "needed to be ready" because "this would be a fast-track job."
Later that month, Robert Hamm, president of Berg, met with Chuck Cambry, president of River City. Although Hamm was displeased that River City had submitted a late bid, he nevertheless negotiated with Cambry for the sheet metal contract. River City agreed to perform the work for $414,000.00 and Berg awarded the job to River City.
On August 20, Hamm met with Auttonberry and Chuck Davis from A & W and told the two that Berg had awarded the sheet metal contract to River City because of their substantially lower bid. Hamm offered A & W $15,000.00 to cover its estimating expenses, which A & W refused. A & W subsequently sued Berg for breach of contract and unfair trade practices. A & W also sued River City for unfair trade practices as well as intentional interference with contractual rights.

ACTION OF THE TRIAL COURT
The trial court held that Berg accepted A & W's offer to perform the sheet metal work and awarded A & W $130,000.00 for lost profits and $25,000.00 for damage to business reputation and related claims. However, the court rejected A & W's unfair trade practices claims against Berg and River City. Further, the court rejected A & W's intentional interference with contract claim against River City as insufficient under 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989).

ISSUES PRESENTED FOR REVIEW
1. Whether Berg accepted A & W's offer to perform the sheet metal work and, if so:
A. Whether the trial court erred by awarding A & W $130,000.00 for lost profits.
B. Whether the trial court erred by awarding A & W $25,000.00 for loss of business reputation and opportunity.
2. Unfair Trade Practice and Consumer Protection Law.
A. Whether the trial court erred by overruling Berg's exception of no right of action under the Louisiana Unfair Trade Practice and Consumer Protection Law (UTPCPL) and, if not, whether Berg is liable under that law.
B. Whether the trial court erred by denying A & W's UTPCPL claim against River City.
3. Whether the trial court erred in rejecting A & W's claims of intentional interference with contract against River City.

DISCUSSION

1. BREACH OF CONTRACT
The initial question presented is whether the trial court was manifestly erroneous in finding as a fact that Berg accepted A & W's offer to perform the sheet metal work. The law of consent is found in LSA-C.C. Art. 1927, which provides:
A contract is formed by the consent of the parties established through offer and acceptance.
Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.
In its reasons for judgment, the trial court stated "A & W's offer to perform the sheet metal work for $514,000.00 was accepted by Berg's actions and inactions which clearly *162 indicated consent. Berg's subsequent actions constituted a breach of contract." We agree.
Each party presented voluminous testimony regarding the construction bidding process in general and, in particular, the significance of being the "low bidder." Chris Colvin, Berg's operations vice-president, testified that, in general, Berg awards contracts to the lowest responsible bidder and that subcontractors are expected to submit their bids before the bid deadline. He also stated that, in his 17-years of experience, he could not recall an occasion when Berg used a bid submitted after the general deadline. Robert Hamm, president of Berg, and Charles Canfield, a project manager for Berg, also testified that subcontractors are expected to submit bids before the general deadline and that the low bidder typically is awarded the contract.
Gary Baird, a Berg employee responsible for estimating and bidding, accepted subcontractor bids on the State Farm job. He testified:
Q (Counsel for A & W): When A & W was told, after bid time, that they were low and that Berg had used their price, that would mean to them that they had the job, right?
A: They could interpret it that way, yes.
Q: And that would be Berg's understanding of what that meant, too. Isn't that correct?
A: That's correct.
Baird also testified that Berg's internal policy was to award subcontracts to the lowest responsible bidder.
Richard Auttonberry, A & W's president, testified that he believed that A & W had the contract when Berg told him that A & W's price was lowest and had been used in Berg's bid.
Ronald Moore, president of M & M Construction and an expert in construction bidding, testified that in that industry bids from all subcontractors and sub-subcontractors are expected to be submitted before the bid deadline for general contractors. He related that industry practice is to award contracts to the lowest responsible timely bidder, and that when a contractor tells a subcontractor that they were the lowest bidder, the subcontractor may reasonably believe that they have the job. In fact, Moore related that in his 21 years of experience, he had never been told that his bid was low and subsequently not been awarded the contract.
The trial court noted the contrary testimony of Howard Angle, another expert in construction bidding, who stated that his company had often been the low bidder on a job and subsequently not performed the work. He related that merely being told that one's bid was low and had been used to formulate a price would be insufficient to constitute acceptance of the bid. Michael Colvin, another bidding expert, also testified that being told that one had submitted the lowest bid was insufficient to establish a contract.
Under the following evidence, the trial court could have reasonably found as a fact that Berg accepted A & W's bid. The evidence established that, typically, the lowest responsible timely bidder is awarded the contract. Thus, by telling A & W that its bid was used to prepare the total bid because it was low, Berg led A & W to believe that the typical result would obtain in this instance. Although the expert testimony did not establish that the lowest bidder is always awarded the contract, when Colvin told Auttonberry that a Berg manager would soon contact A & W and that A & W should get ready for a fast track job, Berg clearly indicated its consent to A & W's offer to perform the work. The significance of these words is plain Berg expected A & W to fulfill its promise to timely complete the job according to its bid. The trial judge also considered the August 20, 1990 offer by Berg to pay A & W $15,000 to cover A & W's estimating expense and disappointment.
The testimony also supports the finding that the parties intended no particular form for their contract. Several witnesses related that, for various reasons, work on construction contracts is often begun before the agreement is reduced to writing, particularly on a "fast track" job.
We conclude the trial court was not clearly wrong in finding as a fact that a contract was formed between Berg & A & W.

*163 DAMAGES FOR BREACH OF CONTRACT

A. LOST PROFITS
Damages for the breach of a contract are measured by the loss sustained by the obligee and the profit of which he has been deprived. LSA-C.C. Art. 1995. Damages for lost profits must be proved with reasonable certainty and will not be allowed where purely conjectural. Tide Craft, Inc. v. Red Ball Oxygen Co., Inc., 514 So.2d 664, 672 (La.App.2d Cir.1987).
Richard Auttonberry testified that A & W's profit margin for commercial construction projects was between 34 and 35 percent, and that he had used this margin when calculating A & W's bid to Berg. He related that the State Farm job would cost A & W approximately $380,000.00. Although Auttonberry did not include overhead or administrative costs in his calculations, he related that these costs would have been very insignificant because A & W had sufficient equipment and personnel to complete the job. He also stated that the one-third profit margin was consistent with A & W's previous performance. The testimony of A & W's accountant, where relevant, tends to support this estimation.
Considering the wide discretion of the trial judge in awarding damages for lost profits, the $130,000.00 award for lost profits is not manifestly erroneous.

B. OTHER DAMAGES
The discretion of the trial court to award damages for breach of contract, while broad, is not unlimited. An award of damages must have some basis in the evidence. We do not believe that the award of damages for loss of business reputation and opportunity finds support in the record.
The award of damages for loss of business reputation was apparently based on Auttonberry's testimony that "it was common knowledge through ... the construction grapevine ... that we had the State Farm project" and that he had received "a lot of calls about it ... everybody feels that there's some ... they want to know what's wrong... there must be a problem here somewhere." However, Auttonberry later testified that the loss of the State Farm job had never caused a supplier to refuse to deal with A & W. Further, he related that A & W had never been denied work nor been refused the opportunity to bid on a job because of Berg's breach. Therefore, this element of damage is unproven.
The award for loss of business opportunity was based upon one foregone opportunity to submit a bid on a school construction project. However, Auttonberry's testimony did not show either that A & W was likely to have been awarded this contract or that A & W would have made a profit had the company done the job. Thus, the proof of these damages is too slight to support any award.
Because we consider these unsubstantiated claims insufficient to support an award of damages for loss of business reputation or opportunity, we vacate the $25,000.00 award.

2. UNFAIR TRADE PRACTICES
LSA-R.S. 51:1401 et seq. sets out the Louisiana Unfair Trade Practices and Consumer Protection Law (UTPCPL). Section 1409 of the UTPCPL provides a private right of action to "any person who suffers any ascertainable loss of money or movable property ... as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405" (emphasis added).
Person is defined in LSA-R.S. 51:1402(8) as:
"Person" means a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity.
LSA-R.S. 51:1405(A) forbids "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" (emphasis added).
Trade or commerce is defined in LSA-R.S. 51:1402(9) as:
"Trade" or "commerce" means the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes *164 any trade or commerce directly or indirectly affecting the people of the state.
Based upon a plain reading of the above statutes, the trial court correctly overruled Berg's exception of no right of action.[2] Berg asserted that it was neither a business competitor of A & W nor was the bid process a "consumer transaction" within the meaning of LSA-R.S. 51:1402(3). However, neither of these elements was required for A & W to have a right of action against Berg. A & W, a corporation, is clearly within the definition of "person" as set forth in R.S. 51:1402(8) and 1409. Further, the construction bidding process amounts to the "offering for sale" or "distribution" of "any services" or "any property." We are unpersuaded that "business competitor," included as a class of consumers in the jurisprudential definition of unfair practices, should limit the broadly defined class of potential plaintiffs set out in the statute. Although a penal statute and strictly construed, the language in the UTPCPL must be given its plain meaning, which, in this case, provides A & W the private right of action against Berg. See Monroe Medical Clinic, Inc. v. Hospital Corporation of America, 622 So.2d 760, 763 (La.App.2d Cir.1993).

BERG'S LIABILITY UNDER THE UTPCPL
The UTPCPL does not define "unfair methods of competition," but relegates to the courts the task of determining, on a case-by-case basis, whether particular conduct violates the statute. Conduct is deemed unlawful if it involves fraud, misrepresentation, deception, breach of fiduciary duty, or other unethical conduct. Core v. Martin, 543 So.2d 619 (La.App. 2d Cir.1989). A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers, including business competitors. Ahmed v. Bogalusa Kidney Care Center, 560 So.2d 485 (La.App. 1st Cir.1990), writ denied 564 So.2d 324 (La.1990); Roustabouts, Inc. v. Hamer, 447 So.2d 543 (La.App. 1st Cir.1984).
In our review of the trial court's denial of UTPCPL damages, we are reminded that it is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Much of the evidence pertaining to the breach of contract claim is also relevant to the determination of the propriety of Berg's actions. As set forth above, the bid process typically results in the award of contracts to the lowest timely bidder. However, the testimony established that this result does not always obtain. Similarly, Auttonberry testified that he was not familiar with the industry guidelines for the bidding process which suggest that low bidders be awarded contracts. Further, while some of the expert testimony indicates that accepting a late bid is unethical or at least unexpected, other testimony suggests that the practice occurs with sufficient frequency to substantially reduce the import of the industry guidelines, and that no general industry policy exists regarding the propriety of accepting late low bids.
We find no manifest error by the trial court in finding that Berg's actions, while sufficient to establish acceptance of A & W's offer, do not violate established public policy or ethics to the degree necessary to impose damages under the UTPCPA.

RIVER CITY'S LIABILITY UNDER THE UTPCPA
For similar reasons, we agree that River City's actions do not entitle A & W to damages under the UTPCPA. River City submitted its late bid in response to a timely request from Berg; a River City representative called Berg before sending their bid to ensure that the bid could be submitted in *165 spite of its apparent untimeliness. The trial court was entitled to accept the testimony of the experts that River City's actions were not a substantial violation of industry practice. From this conclusion, the court reasonably determined that River City had not violated public policy to the extent required for damages under the UTPCPL.

3. INTENTIONAL INTERFERENCE WITH CONTRACT
The trial court rejected A & W's claim of intentional interference with contractual rights against River City on the basis of this court's decision in Lynn v. Berg Mechanical, Inc., 582 So.2d 902 (La.App. 2d Cir.1991), which stated:

Spurney [supra] did not adopt the broad common law doctrine of tortious interference with contracts, but recognized a limited and narrowly defined cause of action for the breach of duty by a corporate officer to refrain from intentionally and unjustifiably interfering with a contractual relationship between the officer's corporate employer and the particular plaintiff.
As is reflected by this passage, Louisiana courts have limited the Spurney decision to its facts. The "interference" alleged in this case is entirely beyond the cause of action created in that decision, and the trial court correctly denied A & W's claim.

DECREE
For the reasons assigned, the judgment appealed is amended to delete the award of $25,000 to A & W for loss of business reputation and opportunity. Otherwise, the judgment is affirmed. Costs are assessed 70 percent to Berg and 30 percent to A & W.
AFFIRMED AS AMENDED.
NOTES
[1] Appellant is erroneously named as Berg Mechanical, Inc. in the caption.
[2] A & W has not argued the distinction between no right and no cause of action, but regardless of which it is, the result is the same. See Monroe Medical Clinic v. Hospital Corp. of America, 522 So.2d 1362 (La.App. 2d Cir.1988).