# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**08-599 consolidated with 08-600**


**INDEST-GUIDRY, LTD., ET AL.**

**VERSUS**

**KEY OFFICE EQUIPMENT, INC., ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 69,115
HONORABLE KEITH RAYNE JULES COMEAUX, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and Marc T. Amy, Judges.

**AMENDED AND AFFIRMED AS AMENDED.**

**Stacy Butler
Kizer, Hood & Morgan, L.L.P.
2111 Quail Run Drive
Baton Rouge, LA 70808-4127
Telephone:  (225) 761-0001
COUNSEL FOR:**
  Defendants/Appellants - Key Office Equipment, Inc. and Kenny
  Gregory

**Randy M. Guidry
Durio, McGoffin, Stagg, & Ackermann
P. O. Box 51308
Lafayette, LA 70505
Telephone:  (337) 233-0300
COUNSEL FOR:**
  Plaintiff/Appellee - Indest-Guidry, Ltd., d/b/a Impressions Print
  Design and Marketing

**THIBODEAUX, Chief Judge.**

This case involves contract disputes between the plaintiff/appellee, Indest -Guidry, LTD, d/b/a/ Impressions Print Design and Marketing (Impressions), and the defendants/appellants, Key Office Equipment, Inc. (Key) and Kenneth Gregory (Gregory), owner and president of Key. Impressions filed suit alleging fraud, conversion, and breach of contract against Key and Gregory for failing to pay off equipment, pursuant to an oral contract, with the proceeds of a transaction orchestrated and disbursed by Key and Gregory.

Key reconvened, alleging that Impressions failed to pay invoices for service and maintenance provided by Key on equipment at Impressions' location. The cases were consolidated. Following a bench trial, the court awarded $48,901.38, plus ongoing rental fees, to Impressions, and awarded $5,241.66 to Key for past due maintenance fees. Key filed this appeal. We amend, and affirm as amended, the judgment of the trial court.

I.

**ISSUES**

We must decide:

(1)　whether the trial court abused its discretion in the recovery awarded to Impressions based upon the agreements in place between the parties;

(2)　whether the trial court abused its discretion in the recovery awarded to Key based upon the agreements in place between the parties;

(3)　whether the trial court erred in awarding attorney fees to Impressions under the Louisiana Unfair Trade Practices Act; and

(4)　whether the trial court erred in granting judgment against Kenneth Gregory, personally.

II.

## FACTS AND PROCEDURAL HISTORY

Impressions had four copiers at its printing company in Breaux Bridge, Louisiana. Two were black and white copiers, and two were color copiers, all manufactured by Konica. Impressions entered into two maintenance agreements with Key on December 5, 2003. One agreement covered the black and white copiers, and one agreement covered the color copiers. Both agreements provided that the maintenance would include all parts, labor, travel time, developer, photo receptor, toner, and staples. The price for maintenance on each of the four copiers was a price-per-copy amount, and it was based upon periodic meter readings from each machine. The maintenance agreements called for quarterly billing.

Impressions' two existing color copiers were the Konica 7920 and the Konica 8050. In February of 2004, Impressions and Key began discussing output and marketing strategies, and it was determined that it would be more profitable for Impressions to replace the 7920 with a second 8050. The 7920 had not functioned as expected, and Impressions' goal was to have Konica take it back and allow a trade up to the 8050. More than one pricing proposal on the new 8050 was made by Gregory, owner of Key and authorized seller for Konica. An early proposal for the 8050 and its component parts was $61,462.17. Gregory, who did not finance the machines that he sold, became heavily involved in the financing end of the discussions between Charlene Guidry, owner of Impressions, and two possible lenders/lessors. Ms. Guidry gave Gregory authority to negotiate on her behalf.

During six months of discussions about component parts and pricing, the parties attempted to arrange financing that would pay for the purchase of the new 8050, and pay off Guidry's lease on the 7920, all under one transaction. Ms. Guidry

alleged that the final transaction agreed upon in August 2004, was with G.E. Capital for $95,500.00, and it was to pay off $22,000.00 owed on her existing lease on the 7920, and pay for the new 8050 at a special purchase price of $65,500.00. She was to receive the remaining funds, approximately $8,000.00, as working capital.

The total proceeds of the $95,500.00 transaction were delivered to Key, who was not a party to the transaction, and Kenneth Gregory who disbursed the entire $95,500.00 from Key's account. The Konica 7920 was never paid off. At the time of trial three years later, Ms. Guidry was still paying approximately $400.00 per month on the 7920 copier under her original lease contract with Citicorp. She was also paying off the lease to G.E. Capital (G.E.) based upon the $95,500.00 proceeds delivered to Key. Key had picked up the 7920 copier in September 2004 when it delivered the new 8050 copier to Impressions. Hence, the 7920 had been in the possession of Key, at the Baton Rouge location, for three years.

Kenneth Gregory alleged that the new 8050, with all of its component parts, actually cost $91,520.00. He alleged that the difference between the cost and the transaction amount of $95,500.00, approximately $3,400.00, was for shipping, handling, and incidentals such as a developer assembly and bag. He further alleged that the $8,000.00, which actually was disbursed to Ms. Guidry, was a loan that she still owed to Key. Additionally, he alleged that Guidry owed him for unpaid maintenance invoices in the amount of $48,003.25 for the last quarter of 2004 and the first quarter of 2005.

The trial court entered a judgment in favor of Impressions and against Key and Gregory, in solido, and ordered them to pay $22,000.00 for the pay-off of the lease on the 7920, plus $14,800.00 for use of the 7920 copier from September 2004 through October 2007, plus $12,101.38 for attorney fees, plus $400.00 per

3

month commencing in November 2007 until the return of the 7920 copier to Impressions. The judgment also found in favor of Key and against Impressions in the amount of $5,241.66, for unpaid maintenance services.

III.

## LAW AND DISCUSSION

### Standard of Review

Errors of law are reviewed de novo. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). Appellate review of the trial court findings based on credibility calls has been severely limited:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness' story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell,* 549 So.2d at 844-45.

### Recovery Granted to Impressions under the Agreements in Place

Gregory asserts that the trial court misconstrued the financing agreement because its Reasons for Judgment indicated that Impressions purchased the new 8050

4

copier from Key, where, in reality, G.E. purchased the copier from Key and leased it to Impressions. We find that the trial court did not misconstrue the agreement, though the court and the parties, including Key, mischaracterized the transaction at times. The trial court demonstrated that it understood the difference between a lease and a purchase, particularly at the end of trial when it questioned Gregory about any residual on the Citicorp lease on the 7920 copier. Ms. Guidry did not own that machine either. At the end of the lease, which was coming up shortly after trial, Impressions would have to return the 7920 to Citicorp or buy it from them at fair market value.

Even the defendant refers to the G.E. Lease Agreement on the 8050 as a "financing" agreement, and sometimes refers to it as a loan with a borrower. However, the G.E. Lease Agreement contains no truth in lending information, rate, or amount financed, and it does not disclose the total payback at the end of the term. The Lease Agreement executed between G.E. and Ms. Guidry, shows only an agreement to lease described equipment for 60 months at $1,766.75 per month. It also provides that the purchase option at the end of the lease is at fair market value. The G.E. "Approval" document does reflect an approval for an amount financed of $95,500.00 and an invoice total of $95,500.00. Mrs. Guidry did not sign this document.

Key and Gregory contend that efforts to get an approval on a transaction that would pay out the 7920 *and* purchase the new 8050 were unsuccessful, and that the machine purchased, along with accessories added by Impressions, cost the entire amount of $95,500.00. However, the record contains no invoice on the 8050 copier that supports a $95,500.00 purchase price. Further, the 8050 copier leased to Ms.

5

Guidry by G.E., pursuant to the Lease Agreement, was *not* the copier delivered to Impressions by Key and Gregory.

The Lease Agreement between Ms. Guidry and G.E. describes the equipment leased as a Konica 8050, Serial No. *65AEO1506*, and it lists *twelve* accessories, with no pricing either individually or cumulatively. However, the equipment actually invoiced and shipped to Key from Konica, and then delivered to Impressions is an 8050 copier, Serial No. *65AEO1620*, with *seven* accessories, plus toner which is not on Gregory's list or GE's list. Ms. Guidry testified that the description of the equipment was filled out on the G.E. Lease Agreement by Kenneth Gregory, whom she trusted to handle all negotiations. She further testified that she had never seen the third page of the Lease Agreement which lists the last five of the twelve accessories. The plaintiff's exhibit of the Lease Agreement does not contain the third page, while the defendant's exhibit of the same agreement does contain a third page, entitled Schedule A.

Schedule A contains only a listing for five additional accessories, in the same handwriting as the first page of the lease. Page three also contains a signature line for the lessee, which is not signed by Ms. Guidry, as is the first page. Ms. Guidry specifically testified that she did not agree to a trimmer accessory that cost $11,000.00, even though it would have made her general manager happy. Page three of the Lease Agreement listed a "trimmer unit" which, based upon Konica's separate price list, had a retail price of $10,900.00. When questioned about this accessory at trial, Gregory said only that Guidry accepted delivery of that product. There is no evidence to that effect, and Gregory's assertion appears to be a patent misrepresentation to the court.

The cost to Key of the 8050 copier, Serial No. 65AEO1620, and the accessories actually delivered to Ms. Guidry, pursuant to five separate invoices, was approximately $35,128.62. This included the basic copier at a cost of $18,245.00, plus a print controller at $10,580.00, plus approximately six other less expensive accessories. Ms. Guidry had paid $69,000.00 for her slightly older 8050, and she believed that Key's offer of a "special price" on the new 8050 of $65,500.00 was a good deal. After all, he had offered her a similar 8050, though with slightly different accessories, back in February of 2004 for a little over $61,000.00. While Gregory told Impressions that he could get them the new 8050 for a little above his cost, he actually stood to make a profit of almost $30,000.00 on the equipment delivered to Ms. Guidry, *if* he had disbursed the proceeds of the $95,500.00 G.E. transaction as promised. Moreover, there is evidence in the form of a Konica e-mail that Gregory's actual cost on the new 8050 was only $32,076.48, indicating a potential profit of over $55,000.00 on the machine and accessories.

In his brief, in support of his alleged $91,520.00 purchase price for the 8050 copier, Gregory lists the copier plus *thirteen* accessories, which include a Color Profile Kit not listed on the G.E. Lease. The Konica price for this accessory is $2,000.00. Hence, Gregory's assertions regarding the accessories do not even correspond with the accessories that he listed on the Lease Agreement. At trial, Gregory attempted to introduce a document purporting to be the invoice that he sent to G.E. describing the collateral for the $95,500.00 transaction. However, the trial court refused to admit the document because it was not produced in discovery. The record reveals no proffer of the invoice, and the defendant does not assign as error the trial court's refusal to admit the invoice. The trial testimony discussing the invoice

never referred to the serial number, and no party seems to have argued the discrepancy in the serial numbers at the trial of this matter.

However, the record is clear. The machine listed on the Lease Agreement has a serial number of 65AEO1506, and has twelve accessories, but the machine delivered to Impressions and serviced by Key, according to its own invoices, bore the serial number of 65AEO1620, and had basically seven accessories. One accessory that actually was delivered, the IP-901 Print Controller, cost Gregory $10,580.00, and it cost Ms. Guidry $23,000.00. Even so, that accessory was included in the $65,500.00 price that Gregory quoted to Ms. Guidry. There is no dispute that Key is entitled to profit on the equipment it sells, and some of the accessories were very expensive. But the $35,000.00 worth of equipment that Key delivered to Ms. Guidry with seven accessories, does not align with the $95,500.00 worth of equipment and twelve accessories that Gregory listed on the G.E. lease, or with the $91,520.00 worth of equipment and thirteen accessories that he listed in his brief.

After Ms. Guidry's execution of the August 2004 G.E. Lease, she began receiving bills from Citicorp on the 7920 copier lease, which should have been paid off by the G.E. transaction. Over the next three months, Ms. Guidry heard excuses and promises from Gregory asserting that paper work crossed in the mail to an assertion that Konica just took the money out of his account. The record contains numerous similar representations by Gregory that make it difficult to suspend disbelief, and Gregory had no corroborating testimony to support him at trial. He did not call anyone from G.E. Capital, from Konica, or from Key, even though the record is replete with names of people who were involved in some capacity with the negotiations and the maintenance on these machines.

8

The trial court stated in its Reasons for Judgment that Ms. Guidry was very credible and had corroborating testimony, while Mr. Gregory's statements were self-serving with little or no corroboration. Impressions general manager, Dale Zeigler, and Impressions volunteer, Ginger Olivier, testified that they had been present at December 2004 meetings when Ms. Guidry attempted to memorialize the oral contract that she and Gregory entered into four months earlier. She attempted unsuccessfully to get his signature on a letter that contained her understanding of the breakdown of $95,500.00 G.E. disbursement to Key. The letter itself corroborates Ms. Guidry's testimony on the $65,500.00 purchase price of the new 8050 copier. Provision number one stated as follows: "1) Konica would receive $65,500.00 from G.E. Capital to lease the new Konica 8050." Gregory initialed a change which made the provision read, "1) Konica would receive $65,500.00 from Key Office Eq. to purchase the new Konica 8050."

When questioned by the trial court as to why he initialed the first sentence pertaining to the $65,500.00 cost of the copier if it were not a true statement, Gregory said that the Impressions people had come to his office unannounced and agitated. By this time, near the end of trial, Gregory had admitted that the machine had cost him around $40,000.00 and that Key had come out quite well on the $95,500.00 transaction. When asked again by the trial court why he initialed the letter if the price quoted to Ms. Guidry was not $65,500.00, Gregory responded that at the time it seemed like the number that they were working with. The trial court reminded him that the letter was dated December 10, 2004, which was almost four months after the G.E. lease was executed and funded.

We find no manifest error in the trial court's decision to credit Ms. Guidry as having the most substantiated version of the oral contract behind the

9

$95,500.00 G.E. Lease Agreement. The trial court awarded Impressions $22,000.00 to pay off the Citicorp lease on the 7920 copier. The record contains the quote from Citicorp for the buyout on the lease and the machine for $22,512.19. The quote is dated August 13, 2004, and it was good until September 12, 2004. The G.E. Capital Lease Agreement was executed on August 17, 2004. Therefore, the funds were available to pay out the lease and the buyout on the 7920 copier.[1]

When the 7920 was not paid out, Gregory who had possession of the machine ultimately made another agreement with Ms. Guidry to pay her back by allowing her to deduct $400.00 per month from the invoices that she received from Key, for the next five years. Gregory testified that the only reason that the 7920 did not get paid off under the new promise was because Ms. Guidry sold the company and breached her agreement to sign five year maintenance contracts on all of her machines. However, the maintenance agreements that Key had in place were one year agreements. Ms. Guidry testified that she had never seen or signed a five year agreement.

Accordingly, since the 7920 that had been in Key's possession for three years, was not paid off under the G.E. transaction *or* by Key, the trial court also awarded Impressions $14,800.00 for Key's use of the 7920 at his location in Baton Rouge from September 2004, when he picked up the machine, until October 2007. The court further awarded Impressions $400.00 per month for Gregory's use of the machine from November 2007, the time of judgment, until the machine was returned to Impressions. Gregory contends that the trial court awarded Impressions twice for recovery on the 7920 copier.

---

[1]We are aware that, if G.E. had knowingly included the payout of the 7920 copier in the financing of the 8050 copier, as Ms. Guidry thought, the 7920 would then have belonged to G.E., similar to an automobile transaction involving a trade. In fact, this is what Ms. Guidry anticipated, as the record is clear that she wanted the 7920 off of her hands. The subsequent confusion regarding the disposition of this machine we attribute to the multiple representations made by Gregory.

It is true that the court awarded her, and charged Gregory, for a pay-off *and* for usage rental, on the same machine. However, the record indicates that Gregory took the $22,000.00 *and* the machine, while Ms. Guidry continued to pay two lenders/lessors for the same machine at the same time. More specifically, after the lease on the 7920 was not paid off in August of 2004, Ms. Guidry continued making monthly payments to Citicorp on the lease. By the time of trial, she had paid approximately $15,849.84. Moreover, at the end of the Citicorp lease, that was coming up in November 2007, shortly after trial, she would have to return the 7920, that she had not seen in three years, or she would have to buy it from Citicorp at fair market value. We are assuming that she bought it at fair market value since Key had it and she could not return it. We do not know how much the fair market value was at that time. In addition to the Citicorp payments, Ms. Guidry had been paying back the $95,500.00 G.E. lease payments, which really had a total payback of $106,005.00, a transaction that supposedly included the $22,000.00 pay-off on the 7920 copier.

Since Key and Gregory converted $22,000.00 of Impressions' funds for their own use, it would have been more accurate for the trial court to have awarded her the $22,000.00 as reimbursement for the conversion of the G.E. funds, not as a payoff that never took place. Additionally, by the time of trial, Gregory had kept the 7920 on his premises for three years without paying fair rental to Impressions, and therefore he owed rental. We cannot say that this finding is an abuse of discretion. Gregory asserts the second agreement to pay off the 7920 through $400.00 deductions from Key billing. At trial, Ms. Guidry testified that she had only deducted for the reimbursements through the December 2004 quarter. Therefore, Gregory had paid only $1,200.00 on the 7920 copier. Therefore, we will deduct $1,200.00 from the trial court's rental award of $14,800.00, reducing that award to $13,600.00.

11

With regard to the working capital of $8,000.00 which Gregory asserts was a loan and is now owed to Key, we agree with the trial court that it was not a loan but was proceeds from the G.E. Capital funds. In his discovery responses, Gregory stated that the $8,000.00 was "surplus" and was paid to Impressions. We, therefore, affirm all awards to Impressions having to do with the leases on the 7920 and the 8050, and amend those awards by the $1,200.00 reduction, as stated above.

**Recovery Granted to Key under the Agreements in Place**

Key contends that Impressions is indebted to Key for maintenance invoices for the last quarter of 2004 and the first quarter of 2005 in the amount of $48,003.25. The record does not support that assertion. In addition to all of the other problems, Key's service on the copiers had become unsatisfactory. Dale Zeigler, Impressions' general manager, testified that Impressions had a lot of complaints because of delays and an inability on the part of Key to get the parts needed. On March 2, 2005, Ms. Guidry sold Impressions to Ginger Olivier, who had volunteered at Impressions and whose background was in marketing. As part of the sale, Ms. Olivier agreed to pay the final quarterly invoice due to Key in December of 2004. Her check made out to Key Office Equipment in the amount $8,388.75 was received by Key and deposited on March 31, 2005.

The check was accompanied by a letter stating that the $8,388.75 check was for payment of the standing maintenance agreement between Key and Indest-Guidry, Ltd. d/b/a Impressions Print Design and Marketing, for the period of September 15, 2004 through December 15, 2004. Although the record does not contain an invoice for $8,388.75, the letter indicates that it satisfies the amount owed for the last quarter of 2004, and the record contains meter readings for all four machines. The trial court found that the check paid to Key for the last quarter of 2004

12

satisfied the maintenance on the new 8050 copier for 2004. We find that Ms. Olivier's check satisfied the 2004 fourth quarter billing on all four machines maintained by Key for Impressions.

Instead of posting this payment, Gregory submitted invoices to show that he had provided services in the amount of $21,837.45 on the new 8050 copier for the last quarter of 2004 and the first quarter of 2005. He also submitted invoices for services in the amount of $26,165.80 on the other three copiers for the first quarter of 2005, for a total of $48,003.25. Gregory argued that since the maintenance agreements on the older machines were not renewed in December 2004, and since he never had a maintenance agreement on the new 8050, he was entitled to bill as if there were no agreements in place, which is more expensive because he charges for parts, labor, materials and drive time. We note that drive time alone is billed at $135.00 per hour and $202.50 per hour for overtime drive time. There is no evidence that Impressions ever agreed to enter into a contract on this basis.

Ms. Guidry admitted that she never signed a maintenance contract on the new 8050. Key asserted that he gave her one at a December 2004 meeting. There was no such document in the record. Ms. Guidry testified that she understood that they would continue paying the price per copy on the maintenance agreements. She further stated that she did not recall getting any quarterly billing in 2005, as the quarter would have ended in March, and she sold the business March 2nd.

The trial court rejected the invoices submitted by Key for maintenance services on the copiers. The court reasoned that the invoices were numbered sequentially but bore different dates, and that he found it unbelievable that a business like Key would have sequentially numbered invoices over the period of time covered. Gregory has now admitted that the invoices were generated after-the-fact. He

13

referred to them as back-billing. We agree with the trial court that the invoices are not appropriate evidence and reject them as well, for several reasons. The individual invoices submitted as exhibits at trial do not correspond with the invoices listed on the exhibit attached to Key's original petition. They have different dates, different numbers, and different amounts. Further, all ten of the invoices on the two black and white copiers are dated either "2/1/06" or "2/2/06." Likewise, all thirty-two invoices on the older 8050 copier bear the dates "1/27/06" or "1/30/06" or "2/1/06." It is difficult to believe that there were thirty-two service calls on one machine over a six day period. Given that Ms. Guidry sold the business on March 2, 2005, we cannot find that the trial court abused its discretion in denying recovery on the invoices on the older machines where each of those invoices was dated 2006.

The trial court did, however, grant Key recovery for maintenance on the new 8050 for the first quarter of 2005 based upon the meter readings on those invoices, not based upon the charges created by Key. We note that those invoices are dated between October 2004 and March 2005. We, therefore, affirm the trial court's use of the meter readings to calculate a charge for maintenance on the new 8050 for 2005. However, we will amend the amount awarded based upon our review of the trial court's calculations.

The trial court took meter readings from the first and last 2005 invoices, i.e., the January 6th and the March 7th invoices, and came up with 87,361 copies (289,825 - 202,464). The trial court then multiplied the $.06 per copy price, pursuant to the other color copier agreement, times 87,361 copies, and awarded Key $5,241.66 for maintenance on the new 8050 in 2005. However, the check sent to Key in satisfaction of the last quarter's maintenance in 2004 covered the period of September 15 to December 15, 2004. Therefore, the next quarter would have started on

14

December 16, 2004. Ms. Guidry sold the business on March 2, 2005. Hence, we will use the meter reading from the December 28, 2004 invoice and the meter reading from the last February 2005 invoice, which results in 95,828 total copies (273,571 - 177,743). We will not use a multiplier of $.06 per copy. Color copiers generate both color *and* black and white copies. The maintenance agreements on the color copiers charge $.06 per color copy and $.019 per black-and-white copy.

The color copier meters have a black-and-white copy count and a color copy count, in addition to a total copy count. Key's invoices only provide a total copy count. It is unfair to charge the $.06 color copy price for all of the copies when some of the copies produced on the color copiers were black and white. Therefore, we will use an average of the two different copy prices, which is $.039, as our multiplier for the total count of 95,828 copies. The result is $3,737.29. Accordingly, we reduce the award to Key from $5,241.66 to $3,737.29.

### Unfair Trade Practices Act and Attorney Fees

The trial court in this matter found Key and Gregory liable to Impressions under the Louisiana Unfair Trade Practices Act (LUTPA) and awarded attorney fees in the amount of $12,101.38. The Act, located at La.R.S. 51:1401, et seq, was enacted to prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La.R.S. 51:1405. A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous or substantially injurious. A trade practice is deceptive under LUTPA when it amounts to fraud, deceit, or misrepresentation. *Mixon v. Iberia Surgical, L.L.C.*, 06-878 (La.App. 3 Cir. 4/18/07), 956 So.2d 76, *writ denied,* 07-1050 (La. 8/31/07), 962 So.2d 438. Reasonable attorney fees are recoverable under La.R.S. 51:1409 where actual damages are awarded.

15

Key contends that it was error to award attorney fees under LUTPA on three bases: (1) Impressions is not a business competitor of Key's; (2) Impressions is not a natural person purchasing goods and services for personal, family, or home use; and (3) Impressions is not an individual filing in a non-representative capacity.

The Third Circuit Court of Appeal has limited its interpretation of the LUTPA provisions to provide recovery only to those who are direct consumers or business competitors. *Vermilion Hosp., Inc. v. Patout*, 05-82 (La.App. 3 Cir. 6/8/05), 906 So.2d 688 (business competitor failed to sufficiently allege competitor status and was not consumer; and defendant's conduct did not rise to level of a LUTPA claim); *Washington Mut. Bank v. Monticello*, 07-1018 (La.App. 3 Cir. 2/6/08), 976 So.2d 251, *writ denied*, 978 So.2d 369 (La. 4/25/08) (resident is not direct consumer as she did not sign promissory note).[2] There have been no allegations that Impressions was a business competitor of Key's. Competitor status is probably the most

_____

[2]La.R.S. 51:1402. Definitions (in pertinent part)

As used in this Chapter, the following words and phrases shall have the meanings hereinafter ascribed to them:

(1) "Consumer" means any person who uses, purchases, or leases goods or services.

(2) "Consumer interest" means those acts, practices, or methods that affect the economic welfare of a consumer.

(3) "Consumer transaction" means any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use.

. . . .

(8) "Person" means a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity.

(9) "Trade" or "commerce" means the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state.

. . . .

16

straightforward criterion in our analysis, and we will not belabor that issue. Impressions does not seek to recover under LUTPA as a business competitor.

While the third circuit is clear that one must be a competitor or a direct consumer to recover under the Act, the identification of a consumer is much less straightforward than that of competitor, primarily because of LUTPA's meanderings along the language continuum from expansively broad to severely limiting provisions. More specifically, "consumer" is defined in the Act as "any person who uses, purchases, or leases goods or services." La. R.S. 51:1402(1). "Person" means a *natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity*." La. R.S. 51:1402(8) (emphasis added). Key seeks to deny recovery to Impressions citing our decision in *Mixon v. Iberia Surgical, L.L.C.*, 06-878 (La.App. 3 Cir. 4/18/07), 956 So.2d 76, *writ denied,* 07-1050 (La. 8/31/07), 962 So.2d 438.

*Mixon* borrowed language directly from La.R.S. 51:1402(3), which states, in spite of the broad definitions of "consumer" and "person" above, that a "consumer *transaction*" means any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use." 51:1402(3). Accordingly, Key points out that Impressions is not a natural person, but is a business entity, who is not purchasing goods or services for personal, family, or home use. While not specifically citing La.R.S. 51:1402(3), the panel in *Mixon* quoted the language, *along with* the broader language of La.R.S. 51:1402(1) defining consumer as *any person* who uses, purchases, or leases goods or services. However, the court *first* reached the merits of the claim and determined that the conduct of the LLC in releasing Dr. Mixon from its membership, under the terms of the mutually agreed upon contract, did not amount to fraud, deceit

17

or misrepresentation. The court then indicated, without explanation, that Dr. Mixon was not a competitor or consumer under the Act.

*Mixon* appears to be the only third circuit case to use the language of La.R.S. 51:1402(3), pertaining to a "consumer transaction," to deny coverage, and *Mixon* did not say that LUTPA *only* covers consumers who are natural persons buying household goods. *Mixon* is not dispositive in the present case where we have fraud, deceit, and misrepresentation, and a plaintiff who is a consumer under the specific definitions of "consumer" and "person" in La.R.S. 51:1402(1) and (8). Our analysis will, therefore, continue.

While third circuit cases have not specifically addressed the limitation of the Act to natural persons, pursuant to the definition of "consumer transaction" in La.R.S. 51:1402(3), we have reached the merits of claims under LUTPA even though the plaintiff was not a natural person *or* the goods and services were not for personal, family, or household use. *See Doland v. ACM Gaming Co.*, 05-427 (La.App. 3 Cir. 12/30/05), 921 So.2d 196 (suit brought by Pat Doland, d/b/a/ Pat's of Cameron; lease at issue signed by Pat Doland individually; recovery granted; gaming company's failure to remove machines violated Unfair Trade Practices Law); *Polar Bear Ice Co., Inc. v. Williamson,* 04-368 (La.App. 3 Cir. 9/29/04), 883 So.2d 1134 (corporate plaintiff; held, breach of commercial lease; denied recovery under LUTPA based upon merits where conduct did not rise to level of a LUTPA claim; no discussion of standing).

*See also*, *Cajun Restaurant and Bar, Inc. v. Maurin-Ogden 1978 Pinhook Plaza*, 574 So.2d 536 (La.App. 3 Cir. 1991) (corporate plaintiffs; held prescribed under 51:1409(E); but reached merits anyway finding Sheriff's sale is legal process, not unfair trade practice; mentioned private action under La.R.S. 51:

18

1409(A) but did not discuss standing); *Fontenot v. Southwest Louisiana Hosp. Ass'n.*, 00-00129 (La.App. 3 Cir. 12/6/00), 775 So.2d 1111, *writ denied* 01-0390 (La. 4/12/01), 789 So.2d 596 (hospital's actions in denying doctor's application for privileges did not amount to unfair trade practice; hospital acted reasonably in denying doctor's application; no discussion of standing).

Other Louisiana circuits have not limited consumers to natural persons. For example, in *A & W Sheet Metal, Inc. v. Berg Mechanical, Inc.*, 26,799 (La.App. 2 Cir. 4/5/95), 653 So.2d 158, the Second Circuit Court of Appeal found that the defendant's exception of no right of action was properly overruled based upon a plain reading of the LUTPA statutes. When the defendant asserted that it was neither a business competitor of A & W, nor was the bid process a "consumer transaction" within the meaning of La.R.S. 51:1402(3), the court found that neither of these elements was required for A & W to have a right of action against Berg.

The court found that A & W, a corporation, was clearly within the definition of a *person* as set forth in La.R.S. 51:1402(8) and La.R.S. 51:1409, which confers a private right of action on any person who has suffered an ascertainable loss by another's unfair or deceptive method. Further, the court reasoned that the construction bidding process in the A & W case amounted to the offering for sale or distribution of any services or any property. The court articulated:

> We are unpersuaded that "business competitor," included as a class of consumers in the jurisprudential definition of unfair practices, should limit the broadly defined class of potential plaintiffs set out in the statute. Although a penal statute and strictly construed, the language in the UTPCPL must be given its plain meaning, which, in this case, provides A & W the private right of action against Berg. See *Monroe Medical Clinic, Inc. v. Hospital Corporation of America*, 622 So.2d 760, 763 (La.App. 2d Cir. 1993) [*writ denied,* 629 So.2d 1135 (La.1993)].

*A & W Sheet Metal, Inc.,* 653 So.2d at 164.

19

The First Circuit Court of Appeal in *Barrios v. Associates Commercial Corp.,*481 So.2d 702 (La.App. 1 Cir. 1985) found that LUTPA is not limited to transactions involving household items; rather, the statute establishes two separate categories of regulated activity. One category is the "consumer transaction" of La.R.S. 51:1402(3) covering natural persons in trade or commerce for personal or household use; the other category is the "consumer interest" of La.R.S. 51:1402(2) covering the entire field of the economic welfare of a consumer, which is defined in the statute as any person buying an unlimited array of goods and services.

The court in *Barrios* explained:

> Counsel finds apparent refuge in the wording of § 1402(3) which defines a consumer transaction as ". . . any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use." This interpretation would seem to limit the law's coverage to minor items used "around the house," such as toasters, blenders, power mowers or window-mounted air conditioners.
>
> We find this to be far too narrow a reading of the legislation. § 1402(1) defines "consumer" as "any person who uses, purchases, or leases goods or services." § (2) defines "consumer interest" as "those acts, practices, or methods that affect the economic welfare of a consumer." § (8) defines "person" as "a natural person, corporation, trust, partnership, incorporated association, and any other legal entity." § 1405 says, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of *any trade or commerce* are hereby declared unlawful." (Emphasis added).

*Barrios,* 481 So.2d at 704, 705.

After citing its earlier jurisprudence on the accepted rules for interpreting state statutes, by considering the law in its entirety and all other laws on the same subject matter and avoiding inconsistency, the court in *Barrios* stated:

> It is patently inconsistent to limit the transactions covered to those involving household items, and then to

> define the consumer as any person using (any) goods or services. Accordingly, we hold that there are two different regulated categories: consumer transactions and consumer interests. Each has its limits as defined by the statute.

481 So.2d at 704.

In *Barrios*, the court determined that the purchase of a heavy-duty, special-order, imported truck for commercial use fell within the category of consumer interest and that it was regulated under LUTPA. Ultimately, the truck was found to have been lawfully seized, and the seizure did not violate the Act. Our Louisiana Supreme Court has not overturned these decisions of other circuit courts. We will not expand our interpretations beyond the requirement that a plaintiff must be a consumer by the clear meaning of La.R.S. 51:1402(1) in tandem with La.R.S. 51:1402(8) and other applicable provisions. However, we will not limit our definition of consumer to the constraints of La.R.S. 51:1402(2) and the overly narrow reading that Key attempts to give our decision in *Mixon.*

Key also cites federal cases including *Hamilton v. Business Partners, Inc.,* 938 F.Supp. 370 (E.D. La. 1996). *Hamilton* reluctantly denied recovery under LUTPA because it was bound by the case of *Orthopedic & Sports Injury Clinic, v. Wang Laboratories, Inc.,* 922 F.2d 220 (5th Cir.1991). There, the plaintiff was a medical clinic bringing claims against Wang, the seller and servicer of its computers, for destroying valuable disks during repairs. The federal Fifth Circuit found that the purchase of the computer equipment did not amount to a "consumer transaction" since it was not primarily intended for personal, family or household use; consequently, the clinic had no cause of action under LUTPA.

*Hamilton* provided a comprehensive analysis of consumers in state court cases under the Louisiana Act, finding that the law in this area was fluid and that federal jurisprudence resting upon it was therefore subject to change. The court

21

summarized its analysis by stating that "Louisiana appellate courts have given conflicting messages about LUTPA's scope, with no state supreme court decision rendering the definitive answer." *Hamilton*, 938 F.Supp. at 373. The court then compared its binding precedent of *Wang* to the completely contrary decision in *Barrios* and cited other Louisiana decisions that have dealt with LUTPA claims brought by consumers of items other than those for personal, household or family use.[3] *Hamilton*, 938 F.Supp. 370. *Hamilton* articulated in a footnote that had the Louisiana legislature intended to link the definition of "consumer" to the definition of a "consumer transaction," it would have simply defined a consumer as "one who engages in a consumer transaction" rather than giving it the broad definition set forth in the statute. *Id*. at 375, fn. 14. The court concluded its decision by stating that it could find no Louisiana case which limited the definition of a "consumer" under LUTPA to that described in *Wang*. *Hamilton* was decided in 1996.

Finally, Key asserts that business entities such as Impressions do not have standing to assert claims under La.R.S. 51:1409(A): "Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action *individually but not in a representative capacity* to recover actual damages . . . . In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs." La.R.S. 51:1409(A) (emphasis

_____

[3]*See Gour v. Daray Motor Co.,* 373 So.2d 571 (La.App. 3 Cir. 1979), *writ granted,* 376 So.2d 1270 (La.1979), *writ dismissed,* 377 So.2d 1033 (La.1979) (automobile used primarily for business); *Bohm v. CIT Financial Services, Inc.,* 348 So.2d 132 (La.App. 1 Cir. 1977), *writ denied,* 350 So.2d 673 (La.1977) (truck owned by business); *Faris v. Model's Guild,* 297 So.2d 536 (La.App. 4 Cir. 1974), *writ denied,* 302 So.2d 15 (La.1974) (professional modeling course). In *Canal Marine Supply, Inc. v. Outboard Marine,* 522 So.2d 1201 (La.App. 4 Cir. 1988), the plaintiff was a marine supply company suing its distributor for wrongful termination of the dealership agreement.

added).  This provision of LUTPA is entitled, "Private Actions."  This language in La.R.S. 51:1409(A) refers to "the clear ban against class actions by private persons" under the Act.  *State ex rel. Guste v. General Motors Corp.*, 370 So.2d 477, 483 (La.1978) (Dennis, J. Concurring).

As previously indicated, the third circuit has reached the merits of various claims by business entities without questioning their standing under the Act if they otherwise met the criteria of a consumer or competitor.  A case which may seem at first blush to address the issue is *Dolan v. ACM Gaming Co.*, 921 So.2d 196.[4] However, that case did not interpret the provisions at issue herein and is not dispositive of this case.  "The determination of what constitutes an unfair trade practice is fact-sensitive and, as such, can only be decided on a case-by-case basis." *Id*. at 202.  In this case, Impressions is not bringing suit against G.E. Capital on the Lease Agreement that Ms. Guidry executed with them.  (Ms. Guidry actually executed her leases in the name of her other company, Southern Tank Testers, due to its longer credit history and credit line).  Nor is Impressions suing Key on the maintenance contracts that Impressions entered into with Key.  Impressions is a consumer of Key's services, suing Key and Kenneth Gregory for the oral contract between the parties regarding the disbursement of the G.E. proceeds of $95,500.00.

---

[4]The defendant argued that Pat's Restaurant of Cameron, Inc. was the sole entity that owned the right to bring the action that was filed individually by Doland, pursuant to the tax returns filed on behalf of Pat's Restaurant of Cameron, Inc.  We stated that the issue there of who possessed the right to bring the underlying action was answered by determining the parties to the original lease. The original lease agreement with the defendant did not reference the corporation, Pat's Restaurant of Cameron, Inc.  Instead, the lease's introductory clause stated that the lease was between "Allied Gaming Management, Inc. as Lessee, and Pat's Restaurant of Cameron, d/b/a Pat's Restaurant of Cameron, Cameron, LA, [sic] Louisiana as Lessor," and that the lease was signed by Doland, individually, as "Pat Doland." *Id.* at 201.  Accordingly, we found that the right of action belonged to Dolan.  Then we analyzed the LUTPA claim and granted recovery. *Pat Dolan*, 928 So.2d 196.

We affirm the trial court's judgment finding the defendants liable to Impressions under the Louisiana Unfair Trade Practices Act. We turn now to the last issue in this matter.

**Judgment Against Kenneth Gregory, Personally**

Key asserts that the trial court erred in issuing a judgment that was inconsistent with his prior reasons for judgment. His true objection is that the judgment states that Kenneth Gregory is liable in solido with Key, while the court's written reasons do not. Where the inconsistency is between the reasons for judgment and the judgment itself, our jurisprudence is clear. A judgment and reasons for judgment are two separate and distinct documents. La.Code Civ.P. art. 1918. Appeals are taken from the judgment, not the written reasons for judgment. *Greater New Orleans Expressway Com'n v. Olivier*, 02-2795 (La. 11/18/03), 860 So.2d 22.

Kenneth Gregory argues that he cannot be held personally liable with Key because no evidence was introduced at trial to dispute the distinction between Key, the corporation, and Gregory, the natural person. Therefore, piercing the corporate veil was improper. Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing. La.R.S. 12:93(B) and 12:95[5]. *Manning v. United Medical Corp. of New Orleans*, 04-0035 (La.App. 4 Cir. 4/20/05), 902 So.2d 406, *writ denied*, 05-1313 (La. 12/9/05), 916 So.2d 1063. Impressions asserts that Gregory's actions fall under the fraud exception, and that the court was correct in finding him personally liable. We agree.

---

[5]La.R.S. 12:95. Actions for fraud: Nothing in this Chapter shall be construed as in derogation of any rights which any person may by law have against a promoter, subscriber, shareholder, director or officer, or the corporation, because of any fraud practiced upon him by any of such persons or the corporation, or in derogation of any right which the corporation may have because of any fraud practiced upon it by any of these persons.

"The courts have recognized two exceptional circumstances where the rule of non-liability of shareholders for the debts of the corporation will be disregarded. The first is where the shareholders acting through the corporation commit fraud or deceit on the third party. The second is where the shareholders disregard the corporate formalities to such an extent that the shareholders and the corporation become indistinguishable, or 'alter egos.'" *Amoco Production Co. v. Texaco, Inc.*, 02-240 (La.App. 3 Cir. 1/29/03), 838 So.2d 821, 833, *writs denied,* 03-1102, 03-1104 (La. 6/6/03), 845 So.2d 1096. Here, where Impressions alleged fraud and deceit against Gregory and named him individually in its petition, and where fraud and deceit were found, Impressions is not required to prove alter ego status.

In *Laurents v. Louisiana Mobile Homes, Inc*., 96-976 (La.App. 3 Cir. 2/5/97), 689 So.2d 536, mobile home purchasers filed a petition for damages for violation LUTPA and for fraud, breach of warranty, breach of contract, and deceit, naming as defendants the seller, Louisiana Mobile Homes, Inc. (LMHI), and Thomas Reid, the general manager for LMHI. The plaintiffs sought damages, penalties, and attorney fees from the defendants for the untimely delivery of the mobile home, for defects in its structure and workmanship, for nonconformity of the mobile home to the contract, for false representations, fraud, and for their refusal to return their deposit on the mobile home.

A panel of this court found that the evidence supported the plaintiffs' claims that the defendants had committed unfair trade practices and that the manager was personally liable and liable in solido with the corporation. In so finding, we articulated as follows:

> If an officer or agent of a corporation through his fault injures another to whom he owes a personal duty, the officer or agent is liable personally to the injured third party, regardless of whether the act culminating in the

> injury is committed by or for the corporation and regardless of whether liability might also attach to the corporation. *Cagle v. Loyd*, 617 So.2d 592 (La.App. 3 Cir.), *writs denied*, 620 So.2d 877 (La.1993); *Hemphill-Kunstler-Buhler, Auctioneers & Appraisers v. Davis Wholesale Elecs. Supply Co., Inc.*, 516 So.2d 402 (La.App. 1 Cir. 1987), *writ denied*, 520 So.2d 751 (La.1988).

*Laurents*, 689 So.2d at 543.

After citing the circumstances enunciated in *Canter v. Koehring Co.,* 283 So.2d 716, 721 (La.1973), under which an officer, agent, or employee is liable to a third person damaged solely by reason of the individual's breach of an employment-imposed duty, this court found in *Laurents* that Mr. Reid breached the duty of care through personal fault via the representations that he made to the plaintiffs.

Similarly, in this case, Key and Gregory owed a duty to Impressions to refrain from engaging in fraudulent, unfair, and deceptive acts and practices in connection with describing and delivering the 8050 copier and accessories, in disbursing the funds from the G.E. Capital transaction, and in the use of the 7920 copier. Gregory, the owner and president of Key, negotiated the transaction with G.E. Capital; it was his handwritten description of equipment on the Lease Agreement that bound Ms. Guidry's company for $106,005.00; and, it was his personal representations to Impressions on numerous occasions that the 7920 lease would be paid off from those funds. Accordingly, Mr. Gregory breached the duty of care through personal fault. We find no manifest error in the trial court's judgment that Mr. Gregory is personally liable to Impressions.

IV.

**CONCLUSION**

Based upon the foregoing, we affirm the trial court's judgment in favor of Impressions and against Key and Kenneth Gregory, in solido, for $22,000.00, which we characterize as recovery of converted funds from the G.E. Capital transaction. We further affirm the trial court's award in favor of Impressions and against Key and Gregory, in solido, for past due rental on the 7920 at the time of trial, but we reduce the amount from $14,800.00 to $13,600.00, as set forth above.

We also affirm the trial court's award in favor of Impressions and against Key and Gregory, in solido, for attorney fees in the amount of $12,101.38. We affirm the trial court's award of $400.00 per month in rental fees for the use of the 7920 copier from November 2007, until the copier is returned to Impressions. That particular award was against Key alone.

Finally, we affirm the trial court's award in favor of Key and against Impressions for maintenance services on the newer 8050 copier for 2005, but we reduce the amount, for reasons set forth above, from $5,241.66 to $3,737.29.

All of these awards are subject to judicial interest as provided for in the judgment. All costs of this appeal are assessed against Key and Gregory.

**AMENDED AND AFFIRMED AS AMENDED.**