WILLIAMS, J.,
dissents.
hBecause the trial court was not manifestly erroneous in concluding that defendants violated LUTPA, I respectfully dissent. Moreover, I would modify the trial court’s judgment to increase the award of damages to $20,000 and the amount of attorney’s fees to $10,887.50.
LSA-R.S. 51:1405(A) grants a right of action to any person who suffers any ascertainable loss for a violation of the statute. Cheramie Services, Inc. v. Shell Deepwater Production, Inc., 2009-1633 (La.4/23/10), 35 So.3d 1053. Acts which constitute unfair or deceptive practices are not specifically defined, but are determined on a case-by-case basis. Johnson *1269 Const. Co. v. Shaffer, 46,999 (La.App.2d Cir.2/29/12), 87 So.3d 203; Tyler v. Rapid Cash, LLC, 40,656 (La.App.2d Cir.5/17/06), 980 So.2d 1135. Conduct is deemed unlawful if it involves fraud, misrepresentation, deception, breach of fiduciary duty or other unethical conduct. A practice is unfair when it either offends established public policy or the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers, including business competitors. Shaffer, supra; A & W Sheet Metal, Inc. v. Berg Mechanical, Inc., 26,799 (La.App.2d Cir.4/5/95), 653 So.2d 158.
In the instant case, defendants voluntarily assumed the task of offering for sale and/or distribution water and sewerage services for the benefit of plaintiff’s property. Additionally, plaintiff is a person who used and paid for goods or services, ie., water and sewerage services, provided by defendants. Therefore, under the clear language of LUTPA, plaintiff is a “consumer.” Consequently, the trial court did not err in concluding that laLUTPA is applicable.
The trial court also concluded that defendants violated LUTPA when the water service to plaintiffs property was terminated without notice. The court specifically found that Mr. Autrey acted in bad faith and that his actions were egregious and were motivated by his desire to own the entire parcel of land on which the mobile home park sits.
The evidence of record supports the trial court’s conclusion. When defendants purchased the property in 2004, they began voluntarily supplying water and sewerage services to the residents of the mobile home park. When plaintiff assumed ownership of his properties, the water and sewerage services were available. Thereafter, in December 2008, Mr. Autrey severed the water line, thereby terminating the water services, without providing notice to the property owners. Mr. Autrey admitted that plaintiff asked him to restore the water services and that he led plaintiff to believe that he would do so. However, rather than restoring the services, on January 26, 2009, Mr. Autrey notified plaintiff that the water and sewerage services were permanently terminated. It is noteworthy that Mr. Autrey continued to supply water and sewerage services to his other properties adjacent to the mobile home park. Mr. Autrey admitted that those properties shared the same water line as the mobile home park. I also note that prior to terminating the water services, Mr. Autrey had made numerous offers to purchase plaintiffs property, first to plaintiffs mother, then to plaintiff. In fact, when Mr. Autrey notified plaintiff that the water services had been terminated permanently, that notice was accompanied by another offer to | ¡¡purchase plaintiffs property.
Additionally, Regina Prewitt testified that she and her three young children were residents of the mobile home park when Mr. Autrey disconnected the water. She stated that Mr. Autrey did not notify her of his intent to disconnect the water. She also stated that she asked him to reconnect the water services; he refused to do so. Ms. Prewitt stated that Mr. Autrey informed her that “he was never turning it back on.” She also testified that after Mr. Autrey disconnected the water, he ran a water hose across the street for “a few days” and later offered her $20 to purchase bottled water for her family’s use. Ms. Prewitt further testified that she offered to furnish her own water supply by either placing a tank on top of her mobile home or by having a well installed. She stated that Mr. Autrey informed her that if she placed a well or tank on the property, he would not allow her to use the *1270 sewerage. Additionally, Ms. Prewitt testified that she owned two lots in the mobile home park, and defendant had offered to purchase her lots “a few times,” both before and after he terminated the water services.
Plaintiff testified that after Mr. Autrey disconnected the water, he met with him and attempted to resolve the issues pertaining to the water lines. According to plaintiff, he suggested sharing the expenses of repairing the water line. Plaintiff testified that he also offered to obtain water services from the city of Ruston. However, Autrey rejected both alternatives. Like Ms. Prewitt, plaintiff testified that Mr. Autrey informed him that he would not be allowed to use the sewerage even if he managed to obtain water .[¿services elsewhere.
Defendants’ contention that they terminated water and sewerage services to the mobile home park for financial reasons due to a “massive water leak” was contradicted by Mr. Autrey’s testimony. Mr. Autrey testified, and the evidence confirmed, that in the three years prior to terminating the water services, he paid only approximately $208 in costs for maintaining the water line; $198 of that cost was for the annual Department of Environmental Quality permits. Mr. Autrey also testified that he was unable to locate the “massive leak” in the water line leading to the trailer park. However, he admitted that he never hired a plumber to attempt to locate and repair the leak because he “didn’t want to spend the money.”
Additionally, the water bills for the mobile home park were introduced into evidence. The water bills for the months leading up to the termination of water services ranged from $198-$221. The evidence also showed that in prior years, the water bills exceeded $800 per month at times, which indicated water leaks. Each time, Mr. Autrey merely repaired the leaks and paid the water bills; he never disconnected the water. However, in this instance, rather than locating and repairing the water leak or hiring a plumber to do so, Mr. Autrey chose to permanently terminate water services to the mobile home park.
For these reasons, the trial court did not err in finding defendants violated LUTPA by engaging in unfair practices. Mr. Au-trey’s testimony revealed that he owned over 22 acres of land adjacent to the mobile home park. He candidly admitted that he wanted to own the additional five acres |fiwhich comprised the mobile home park so that he could control the property “in any way that [he] saw fit.” Based on this record, defendants’ actions were unethical and unscrupulous, and, as such, in violation of LUTPA.
Moreover, plaintiff answered the appeal, contending the trial court abused its discretion in awarding damages. He argued that he cannot use or rent the mobile home without water services; therefore, he is entitled to be compensated for the decrease in the value of his property.
Any person who suffers an ascertainable loss as a result of an unfair or deceptive act may bring an action to recover actual damages. LSA-R.S. 51:1409(A). The assessment of damages is a determination of fact, one entitled to great deference on review. See v. Entergy Corp., 2010-0065 (La.6/4/10), 35 So.3d 1081; Wainwright v. Fontenot, 2000-0492 (La.10/17/00), 774 So.2d 70. Accordingly, a reviewing court’s role in examining damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. See v. Entergy Corp., supra; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). If an appellate *1271 court finds that the trier of fact clearly abused its discretion, it can only disturb the award to the extent of lowering it (or raising it) to the lowest (or highest) point which is reasonably within the discretion given to that court. See, See v. Entergy Corp., supra; Coco v. Winston Indus., Inc., 341 So.2d 382 (La.1977).
In the instant case, Mr. Autrey testified that plaintiff informed him that he wanted him to continue the water and sewerage services to his [ fimobile home. However, Mr. Autrey denied having knowledge that plaintiff planned to rent the trailer to a tenant. Mr. Autrey testified that plaintiff told him that he planned to use the trailer as a “guest cottage when he had friends that came in.”
Plaintiff testified that he continued to pay the water and sewerage bill after he assumed ownership of the property; he also maintained the other utilities in the mobile home. He stated that he did so because he intended to rent the property “as an income string” [sic]. Plaintiff also testified that after the water and sewerage services were terminated, he met with Mr. Autrey and informed him that he had a prospective tenant and could not rent the mobile home without water and sewerage services. Plaintiff also testified that he had reached an agreement with Marion Faulkner to rent the mobile home for $500 per month.
Richard Gene Nealy, a licensed real estate broker, was accepted by the court as an expert “in evaluation of residential rental property in the Lincoln Parish area.” Mr. Nealy submitted an appraisal for the mobile home in question as follows:
* ⅝ *
Rental of $500 per month for this unit size and condition would be typical in this market and is used to capitalize value as depicted below[:]
Capitalization of Income: Rental @ $500 per month, annualized to $6,000
Less projected expenses:
Taxes: -90.00
Insurance (estimated): -300.00
Maintenance: -300.00
Vacancy: -600.00
Depreciation: -600.00
|7Net Estimated Income: $4,110.00
Capitalization: 7% cap rate ($4,110/.07) = $58,714.00
[I]t is my opinion that the value of this property, as of July 29, 2011, would be:
Value and lots and mobile home, without utilities $ 9,000.00
Value and lots and mobile home, with utilities capitalized @ 7% $58,714.00
[[Image here]]
Mr. Nealy testified that he used the “income approach,” which uses the prospective income of a property to determine the value of the property. He also explained that the “cap rate”, in this case 7%, is “a reasonable anticipated rate of return on your invested dollar.” Mr. Nealy further testified that if a rental mobile home lacks the proper utilities, it cannot be rent *1272 ed, and, therefore, could only either be sold as salvage or moved to a place where rental is possible. He stated that the $9,000 figure is the value of plaintiffs mobile home as listed in the National Automotive Dealers Association (“NADA”).
On cross-examination, Mr. Nealy admitted that plaintiffs property is located in a “B4” zone. Mr. Nealy also admitted that he did not know all of the restrictions of B4 zoning and was uncertain whether or not the mobile home could be rented as a residence because of the zoning. However, on redirect, he testified that the zoning of the mobile home park did not result in the revocation of the subdivision restrictions. Mr. Nealy stated that a residential classification was a lower classification than B4. Therefore, the property could be used for a lower classification, i.e., residential, but it|scould not be used for higher a classification.
Mark S. Taylor, a real estate appraiser, testified as an expert for the defense. He was accepted by the court as an expert in real estate appraisal. Mr. Taylor described the “B4” zoning classification as a “highway district, which is commercial zoning basically along the interstate highway in Ruston.” According to Mr. Taylor, plaintiffs mobile home could not be used as a residential rental due to the zoning.
Mr. Taylor also prepared an appraisal of plaintiffs property, using the fair market value approach. The appraisal provided:
[[Image here]]
By reasons of my investigation and analysis, data contained in this report, other information in my files, and my experience in the Market, it is my opinion that the formulated opinion of the Market Value of the subject property as of August 2, 2011, is as follows: Scenario 1
Land Value o o
Income Approach to Value o o cT CO
Direct Sales Comparison Approach o o o to CO
Scenario 2
Land Value $ 7,900
Income Appi’oach to Value $39,700
Direct Sales Comparison Approach $21,000
Scenario 3
Land Value o o
Direct Sales Comparison Approach GS o o
(Emphasis in original).
Mr. Taylor determined the “Land Value” by finding the prices of parcels of land which had been sold in the area (one parcel sold for $13,000 ($0.99/Ae); one sold for $8,000 ($0.73/Ac); the other sold for $8,000 ($0.42/Ac)). In determining the “Income Approach to Value,” Mr. Taylor | atestified that he found six other mobile homes in the area and the monthly rental for those units ranged from $350 per month to $700 per month. Thereafter, he approximated the monthly rent of plaintiffs mobile home as $450 per month. In determining the “Direct Sales Comparison Approach,” Mr. Taylor stated that he utilized the sales price of similar mobile homes in the area.
In explaining the three different scenarios, Mr. Taylor testified that he assumed *1273 that plaintiff’s lots and mobile home were real property and that they could be used as residential property. In Scenario 1, Mr. Taylor stated that he assumed that the mobile home was immobilized, habitable and is considered real property.
In Scenario 2, he testified that he assumed that the mobile home had not been immobilized. Therefore, he valued the mobile home as chattel, rather than as real property. He also testified that the market or direct sales comparison with the mobile home as chattel, rather than as real property, substantially decreased the direct sales comparison, while increasing the land value.
In Scenario 3, Mr. Taylor testified that he assumed that the property could not be used as residential and that the mobile home was inhabitable. Therefore, the land would be valued at a no-cost approach based on commercial use; the direct sales was based on the NADA value of the mobile home.
On cross-examination, Mr. Taylor testified that $500 per month rent for plaintiffs mobile home would not be unreasonable because that amount | inis within the range of other rental units in the area. He also stated that if plaintiff self-managed the property, the net annual rental income would amount to $4,473. Using a capitalization rate of .0936, the capitalized rental value of the property is approximately $47,788. According to Mr. Taylor, the value of the mobile home with no utilities is approximately $13,000. However, if the mobile home was sold and had to be removed from the lot, the cost of moving it would have to be deducted from its value.
Mr. Taylor also admitted the value of Mr. Autrey’s interest in the mobile home subdivision would increase if he obtained ownership of the entire parcel of land which comprised the mobile home park. He agreed that 27 acres of service road, whether zoned as residential or commercial, is worth much more than the mobile home subdivision.
Additionally, Mr. Taylor testified that plaintiffs lots are too small to accommodate a sewerage plant. He stated that plaintiff was totally dependent on the sewerage system that defendants had in place.
Mr. Taylor also testified with regard to the city of Ruston’s annexation of the property which resulted in the zone change from residential to B4. He admitted that, in his experience in real estate, when the city annexes an area, the existing uses of the property are “grandfathered.” Therefore, if property was designated a residential subdivision prior to the annexation, it was unlikely that the city would force property owners to change the uses of their property. Mr. Taylor also admitted that since the zone change, residences and mobile homes continue to exist throughout the area.
Inin awarding damages, the trial court took into account the monthly rental plaintiffs property could garner, if utilities, including water and sewerage, were available. The court then multiplied that amount — $500—by six months, and awarded $3,000 in damages. In so doing, the trial court abused its discretion.
Both experts agreed that the mobile home had no rental value if no water and sewerage services were available. Mr. Nealy, plaintiffs expert, opined that the mobile home and lots, without utilities, was only worth $9,000. Mr. Taylor, defendants’ expert, valued the mobile home and lots, without utilities, at $13,000, minus the cost of moving the mobile home to another location.
While the estimates of the rental income of the property, with utilities, varied, both experts agreed that the rental value of the property was worth considerably more *1274 than the $3,000 awarded by the trial court. Defendants’ own expert, assuming that the mobile home was immobilized and habitable,[1] appraised the property at $36,000-$39,000 (using the direct sales comparison approach and income approach to value, respectively).
Consequently, based on this record, an award of $20,000 is appropriate. The expert testimony clearly established that plaintiffs property has essentially no rental value without water and sewerage services. Mr. Autrey’s testimony established that he has no intention of supplying water or sewerage to the property. Even if plaintiff somehow contracted with the city of Ruston for water services, Mr. Autrey has made |12it clear that he is unwilling to allow plaintiff to use the sewage lagoon.
Furthermore, the trial court abused its discretion in awarding $5,000 in attorney fees; plaintiff was entitled to attorney fees in the amount of $10,887.50.
Reasonableness of attorney fees is determined by the factors set forth in Rule 1.5(a) of the Rules of Professional Conduct. These factors include: (1) the time and labor required, the novelty or difficulty of the issues, and the skill required to properly perform the legal services; (2) the likelihood, if apparent to the client, that the matter will preclude other employment; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and results obtained; (5) the time limitations imposed by the client or circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer; and, (8) whether the fee is fixed or contingent. Additionally, when an issue of attorney fees is present in the case, it is within the appellate court’s discretion to award or increase attorney fees for the expense of the appeal. LSA-C.C.P. art. 2164;[2] Smith v. Pilgrim’s Pride Corp., 44,080 (La.App.2d Cir.2/25/09), 4 So.3d 983, writ denied, 2009-0961 (La.6/19/09), 10 So.3d 739.
During the hearing to fix attorney fees, plaintiffs counsel stated that his hourly rate for attorney fees was $130 and that he had expended 83.75 |1shours in pursuing this matter. The record supports the substantial time and labor expended by plaintiffs counsel. Thus, I would modify the trial court’s award of attorney fees, increasing the award to $10,887.50.

. Plaintiff’s testimony that the mobile home was immobilized and habitable was uncontro-verted.

. LSA-C.C.P. art. 2164 provides:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages, including attorney fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.